**Carol Ann CUPPLES**

v.

**TRANSPORT INSURANCE COMPANY and Transport Management Company.**

**Civ. A. No. 3–4576–C.**

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 28, 1974.

Edward B. Cloutman, III, Mullinax, Wells, Mauzy & Baab, Inc., Dallas, Tex., for plaintiff.

George W. Bramblett, Jr., Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

In our present society, entrepreneurship has two basic elements. One is decision-making and the other is ownership. Decision-making can be of at least two types. One, of course, is management in the sense of hiring and firing. The other is decision-making in the sense of the multitude of small day to day dealings that a business enterprise has each day.

Insurance underwriters are of the latter category. They labor for their business enterprise, normally a corporation, but they also make decisions each day as to whether or not a certain risk should be written and if so, at what rate. By his or her decision-making, the underwriter helps determine the economic viability of his company, an entrepreneurship function.

The decision-making ability of an underwriter is of prime importance to the insurance company.

Our Plaintiff is Carol Ann Cupples and our Defendants are Transport Insurance Company and Transport Management Company who shall be referred to as Transport. Plaintiff started out with Transport in 1967 as a Statistical Codes Clerk and had advanced as far as

underwriter when her employment was terminated.

Plaintiff complains that she was discriminated against in violation of 42 U.S.C. Sec. 2000e–2(a) and (d) and Sec. 2000e–3 with respect to hiring, job classifications, promotions, compensation, terms, and conditions of employment in Defendants' underwriting department and with respect to her discharge; and in violation of 29 U.S.C. Sec. 206(d)(1) as to wages. The former are part of the Civil Rights Act of 1964 and the latter a part of the Fair Labor Standards Act. Jurisdiction has been invoked under 28 U.S.C. Secs. 1343(4), 1337, 2201 and 2202. The merits of the case were tried to the Court.

Ms. Cupples was hired by Transport on August 21, 1967, as a Statistical Code Clerk at a monthly wage of $325.00. On February 16, 1968, she became a combined Rate Clerk-Statistical Code Clerk at a salary of $350.00 per month. She became a full time rate clerk at a salary of $390.00 per month on June 1, 1968. Her salary was raised to $450.00 per month and her position was changed to underwriter trainee on September 1, 1968. June 1, 1969, her salary was raised to $525.00 per month. Ms. Cupples achieved her final position with Transport on January 1, 1970, as an underwriter at the same salary. On May 12, 1970, her employment was terminated by Transport.

Plaintiff has alleged that she was discriminated against in four ways. First, that as a rate clerk she was underpaid when compared to underwriter trainees and underwriters who were doing what she considers to be substantially the same work. Second, that she was not promoted to the position of underwriter trainee from rate clerk for a period of time in which less qualified or no better qualified males were hired as underwriter trainees and then was discriminated against by being paid a lower wage as an underwriter trainee and underwriter. Third, that Transport granted a special privilege to males solely because they were males and which was not granted to females. Fourth, that she was fired illegally by Transport because she sought to obtain the same or a similar privilege for females.

## I.

Plaintiff's first contention that she was underpaid as a rate clerk in comparison to the underwriter trainees and underwriters unduly minimizes the differences between the positions of rate clerk and underwriter trainee/underwriter. The proof at trial was that a rate clerk is a clerical employee. Ms. Cupples as rate clerk was required to rate assigned risks. This entailed the filling out of schedules according to previously set rates, no discretion was involved. An underwriter may fill out many of the same forms but he or she is rating unassigned risks. This entails acts of discretion upon the part of the underwriter. The questions of whether or not to write the policy and at what rate must be decided.

The distinction between rate clerk and underwriter is the distinction between labor and entrepreneurship. An insurance company will logically have different criteria for the two positions. Both positions require accuracy and a propensity for detail but the underwriter must have the additional ability of decisionmaker. As stated above, the underwriters largely determine the economic viability of their companies by their day to day decisions. Their value to an insurance company is immensely more than that of a rate clerk.

It is undisputed that underwriter trainees start out by working on assigned risk policies until they become familiar with rating procedures and schedules. Apparently, the time which a trainee will spend on these for Transport will vary from person to person. Ms. Cupples contends that the classification of underwriter trainee is an artificial classification set up in order to pay male employees who were doing rate clerk work more than the rate clerks who have been predominately female. Her employment history belies this con-

tention. As soon as she complained about underwriter trainees being hired from outside of Transport while she worked there as a rate clerk, she was given the position of underwriter trainee. It is true that she was the first female in that job classification, but she was not the first female underwriter. The other female underwriter was an experienced underwriter when hired by Transport so she bypassed the underwriter trainee stage. Since Ms. Cupples' becoming an underwriter trainee, no more women have become underwriter trainees. If Transport were a vast organization, this small number of females might be evidence of tokenism, but in a small company such as Transport it is not.[1]

Also Transport showed that the underwriter trainee was a valid classification not set up to discriminate against women and not having that effect. The employees hired as underwriter trainees were informed when hired that that was their position, the classification was set out in writing, the trainees were supervised and evaluated in their training, advancement depended solely on their ability to become effective underwriters and females have not been excluded from the program.[2]

■ The Fair Labor Standards Act and the Civil Rights Act of 1964 were not enacted to force an employer to pay an employee a lesser wage because he is doing a lower level of work temporarily as part of a training program.

Ms. Cupples' employment history with Transport was different from the other underwriter trainees employed by Transport before she became an underwriter trainee. They were hired from outside of the company and she was promoted internally. She was hired for a clerical position and they were hired for a management position. Her employment record shows a steady rate of advancement every few months. There is no showing on the face of her employment record that Transport ever held back a promotion from her for any reason. In fact, when Plaintiff first showed any interest in becoming an underwriter trainee, only three months after she became a full time rate clerk, she was immediately advanced into the training program. One year and three months after becoming an underwriter trainee, she was advanced to the status of underwriter. Plaintiff testified that the normal time to achieve underwriter was a year to a year and one-half.

Plaintiff at trial compared her salary as an underwriter trainee to the salaries of mainly three other persons, Gary Thompson, Jack Toon and Ramón Haza. Both Mr. Toon and Mr. Haza started out at the same salary as Ms. Cupples. Mr. Haza quit after three months so had no record of advancement. Mr. Toon had been hired almost two years earlier as an underwriter trainee than when Plaintiff became an underwriter trainee. He started out at the same $450.00 per month level that Plaintiff did. He received a raise to $475.00 at the end of

---

1. Plaintiff cites Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir., 1972) for the proposition that statistics can prove discrimination. This is undoubtedly true in appropriate cases such as *Rowe* where many employees (3–5 thousand in *Rowe*) are involved, but, in a case such as ours (90 total employees in all departments), statistics have less probative value.

2. *See* Hodgson v. Behrens Drug Company, 475 F.2d 1041 (5th Cir., 1973), and Shultz v. First Victoria National Bank, 420 F.2d 648 (5th Cir., 1969). These cases are most important in that the disputed classifications never had a female in them and advancement did not depend on the completion of any train-

ing. Advancement depended on the fortuitous opening of a higher position. This in effect is emphasizing that in the *Behrens* and *First Victoria* situations, the employers relied upon the disputed classifications to perform substantial and continuing amounts of work on a day to day basis that was the same as that performed by the lower paid females. In our case, Transport did not rely upon the underwriter trainees as a substantial pool of labor to do rate clerk work. The purpose of the underwriter trainees performing rate clerk work was to familiarize them with the work and they moved on to more difficult tasks as they mastered the rate clerk work.

six months and at the end of his first year was raised to $520.00 per month. Plaintiff was raised to the salary of $525.00 per month nine months after achieving underwriter trainee status. A year and a half after employment, Mr. Toon reached underwriter status and was given a salary of $600.00 per month. Plaintiff made underwriter in a year and three months, but was not given a raise at that time.

Seven days after making underwriter, January 8, 1970, the chain of events started that led to this court case. Plaintiff approached her supervisor, Mr. Bill Davis, and inquired why she had not gotten a raise.[3]

Plaintiff had heard that Gary Thompson was being paid $600.00 per month and she thought that she deserved the same. Mr. Davis' memorandum of that conversation, Appendix "A", speaks for itself and for Mr. Davis. In short, Mr. Davis told Plaintiff three things: first, that she was on a yearly salary review where he was on a six months salary review; second, that she and he were doing similar jobs did not justify the same salary, and, third, that he knew that salaries at Transport were lower than in much of the industry.

Apparently Plaintiff was most concerned about the salary differential between herself and Mr. Thompson. She felt that she was at least the equal of anyone else in the underwriting department and could carry a much higher volume of work than some of the other underwriters. The memo shows that Mr. Davis' opinion of Plaintiff was not the same as hers. He succinctly stated his opinion of her as:

"My own personal opinion is that Carol is an excellent worker, even a perfectionist to some extent, when it comes down to working with known facts—like following set procedures from a manual. But when it comes down to the abstract or elementary aspects of a situation, Carol is lost. I don't know if her intelligence is so high that she is unable to see the simple and elementary facts, or just what the problem is. Her work was excellent on both the Auto and Workmen's Compensation Assigned Risk Desk—everything was in writing and she read the manuals well. She was also good on the Allied Agents, but again this was a set procedure."

■ At trial, Mr. Davis explained quite fully how he arrived at salaries for the Transport employees that he supervised. He made it very clear that wage differentials were arrived at under a bona fide merit system.[4]

Using his evaluation system, Mr. Davis hired Mr. Thompson at the initial salary of $500.00 per month as underwriter trainee, $50.00 more than Plaintiff received. Mr. Thompson advanced to underwriter in what must have been an extraordinarily short time according to the testimony as to what is normal, of six months. At that time he was raised in salary to $560.00 per month. Six months later, he was raised to $600.00 per month. Mr. Thompson is apparently quite a bright young man who when hired had worked hard and had a proven history of ability to make decisions. This was borne out by the work that he performed for Transport. Within six months, he achieved underwriter status which meant that in the eyes of his supervisor there was no need for more senior personnel to review his decisions on unassigned risks as underwriter trainees' decisions are reviewed.

■ The same supervisor who developed his evaluation procedures at trial found that Plaintiff was not at Mr.

3. Mr. Davis typed or dictated a memorandum to the personnel file a week later about this meeting that was introduced at trial and is quite illuminating. A copy of this memorandum is appended as Appendix "A".

4. Such system is a valid exception to equal pay under Sec. 206(d)(1)(ii) of 29 U.S.C., The Equal Pay Act of 1963 and Sec. 2000e-2(h) of 42 U.S.C., the Civil Rights Act of 1964.

Thompson's level in the ability to make abstract decisions, the most fundamental difference between a rate clerk and an underwriter. Mr. Davis arrived at the conclusion that at that time Mr. Thompson was worth more to Transport than Plaintiff was. He arrived at that conclusion by permissible means, a merit system and a system that measured earnings and promotions by quantity and quality of production.

## II.

Plaintiff's last two contentions, that Transport granted a special privilege to males that was not granted to females and that she was discharged because she tried to secure the same or similar privilege were not borne out by the evidence that was presented at trial.

Transport did plan and hold a one-half day annual golf outing and stag solely for its male employees on Friday, May 8, 1970. For a week before Plaintiff tried to interest other female employees in walking out on the afternoon of the eighth. She met with no success. On that Friday, she filled out her time card as if she had worked that afternoon, left at lunch time and did not return that afternoon. The following Monday, Mr. Davis was handed the time cards of the employees whom he supervised for his signature. He was told at that time that Plaintiff was not there on Friday afternoon contrary to the hours listed on her time card. Mr. Davis confronted her with this on the telephone and asked her if she would like to change her time card or fill out a new one. She asked him how he knew she was not there as he had not been there. He replied that he had not been there but that her absence had been confirmed by other employees. The conversation terminated then.

The next day, Mr. Davis called in Plaintiff and told her that her employment was terminated for falsifying her time card. She was told to leave immediately and not to return.

Was Transport justified in discharging Ms. Cupples under these circumstances? Yes. Ms. Cupples was not acting in good faith. The male only golf tournament had been held in previous years. The year before, 1969, the female employees of Transport had felt transgressed against and protested their exclusion without being given a similar benefit. Transport was planning a style show and luncheon for its female employees at the time of the golf tournament. Ms. Cupples never voiced her complaint to Transport's management, she just walked out after falsifying her time and knowing full well what the consequences would be. Plaintiff felt that she had many grievances against Transport. That she had not been promoted rapidly enough, she was underpaid and that she was being kept on a time card basis too long.[5]

Ms. Cupples prior to this incident had put down on a time card that she was present when she was not there and was at a funeral with the express permission of Mr. Davis. She knew that only with such permission could she do so. Her purpose was not to secure the same privilege or a similar one as that accorded males, but to create an incident and back Transport into a corner. The record shows that she had a personal animosity toward Transport that had grown in the several months before May, 1970. Had her desire been to secure the same or a similar privilege, she would have complained to Transport as she had done in the past with great success at reaching her desired result or obtaining a full explanation. Transport has shown that its

5. At the time in January, 1970, that she complained about her salary, she also complained about not being taken off a time card and then Ms. Cupples had had many absences the year before at least most and quite possibly all of which for unquestionable reasons. But her superiors felt that there had been too many in order to take her off of a time card status. This was explained to her by Mr. Davis.

management had always listened attentively to Ms. Cupples and promptly acted or explained why it would not act.[6]

Defendants, Transport, had just cause for discharging Plaintiff, Carol Ann Cupples, May 12, 1970. They gave her opportunity to correct her false time card but she declined. Employees cannot be allowed to flout the reasonable regulations of their employees without just cause in the name of equality.

Defendants' attorneys are requested to draft a proposed form of judgment, submit it to Plaintiff's attorneys for approval as to form and then submit it to the Court for entry.

## APPENDIX "A"

# TRANSPORT INSURANCE GROUP
### Inter-Office Correspondence

From: Bill Davis

To: Personnel File

DEFENDANT'S EXHIBIT

Date: January 13, 1970

Subject: Carol Cupples

On Thursday, January 8, 1970, Carol Cupples entered my office and asked when she would be getting her raise. Caught a little off guard I replied her salary was on an annual review, not a six month review, and as such she would have to wait until June. Before mentioning some of the points discussed during our lengthy conversation it might be well to mention that Carol and her husband were personal friends of my wife and I before Carol took a job with Transport almost three years ago, and because of this Carol was very outspoken during our lengthy conversation; I doubt seriously if she would have used the same approach if someone other than myself had been her supervisor.

1. Carol said she wanted to be paid equal to Gary Thompson whom she knew made $600.00 per month doing the same job as herself. It seems that when Gary Thompson thought he was going to resign from Transport last October, he, or his wife, told Carol what his starting salary was at Transport as well as the amounts of his two raises. This conversation took place one evening when Gary and his wife had invited Carol and her husband over for dinner.

2. Carol said that she was doing just as efficient a job as Gary, and she has always given 100% of her efforts to Transport, and expected to be compensated justly for the work she did. After all, she said, she is working only for that paycheck, just like anyone else at Transport. She does not believe everyone should be paid the same salary as under a union contract, but those that excel should be rewarded. Carol contended that the other "so-called Underwriters" were people of below intelligence, and said she knew for a fact that she could do twice

---

6. It is not disputed that Mr. Davis recommended Plaintiff for her job and was a personal friend of hers. His actions during her employment do not belie their friendship.

the work of some of those making salaries much higher than hers. Carol also said that her review of the classified ads shows $600.00 and above as the starting salary of almost every Underwriter Trainee.

3. I told Carol that if it was salary alone she was looking for then she had no business working for Transport because it is a known fact to most employees that there are other insurance companies in Dallas paying higher salaries than Transport and I doubt very seriously if Transport will ever try to take the lead in this respect. I told Carol that most of the older employees at Transport had at some time during their employment been offered jobs with other companies, but I told her the freedom to prove one's talents is more important than the paycheck.

4. Carol said it was ridiculous to excel at Transport if you aren't compensated for your efforts. For that matter, she said she was capable of doing any job at Transport if she was given the incentive. She said Transport seemed to be complacent with mediocrity and thought Transport would probably be more satisfied replacing her with someone of lower caliber than herself. To quote Carol, "After all, Transport has survived on mediocrity for quite a few years."

5. I told Carol I thought those who showed loyalty to the Company should be compensated to some extent for their loyalty; after all, these are people who give their time and effort to Transport and are not interested solely in a paycheck. Carol's reply was, "Hell, there's not one employee at Transport who really cares about Transport—they only work for that paycheck and that's all." I told her I put many more hours into Transport than 7¾ hours a day and I don't get paid extra for every hour I put in. She said she couldn't understand why I do it because Transport could actually care less.

6. Carol thinks that everyone at Transport (other companies, too) wears two faces. Those who pretend to be "all Transport" could really give a damn—they put on a snow-job for that one and only objective, the paycheck. This is why she thinks it is such a fallacy to reward an individual a little just because he is able to give a better snow-job than the next person. She said she could be wearing the other face and putting on the snow-job just like the others, but instead she is being honest in her conversation with me.

7. I told Carol that I didn't know how she could compare herself on a one to one basis with Gary. I said Gary was hired with certain objectives in mind, and I also said that when a person is hired the law of supply and demand enters the picture when considering a starting salary. I told Carol that Gary has been honest with Transport because when he was hired he told us from the start he wasn't sure if he was getting into the right field. Carol said this was just another front used to get the job because he know right from the beginning he had no interest in insurance as a career. I asked her if she called

Gary being honest with Transport when he announced just one day prior to receiving plane tickets to go to Winston-Salem for a week that he couldn't go in good faith because he planned to resign from Transport in several months in order to return to college. She said this was just another snow-job because he would rather sacrifice losing his job two to three months early than spend a boring week out in the field with a bunch of pseudo intellectuals and also be away from his family.

8. I told Carol she was in a sense a radical because she is against the establishment and institution; the only difference is a true radical is against the establishment and institution, and he is also against material things—his sole interest is people. I told Carol she was against the establishment and institution, but she wanted the establishment and institution to pay her a fat paycheck so she could acquire the material things. She has always considered Dallas people a bunch of conservatives who are unwilling to even reason with an opposite view much less listen.

9. I told Carol that even though she and Gary both had college degrees and doing similar jobs did not necessarily justify the same salary. I told Carol that Gary had a knowledge of the trucking industry since his Dad was an Owner-Operator for Frozen Food and North American Van Lines most of his life. Gary traveled a lot with his Dad and became quite familiar with the business. I also told her that most of the other Under-writers have had past insurance backgrounds. She argued that she had more background in insurance by the time Gary was hired and also had much more knowledge of Transport than Gary—yet, Gary is making $75.00 more a month than she is.

10. Several times during our conversation she mentioned that she felt like taking her case before the Civil Liberties Board (she also named another organization which slips my mind) because of Transport's practice in discrimination. I told her I didn't feel like she had a chance of winning because no person in our department is under paid including herself; however, I told her that maybe one or two who are over paid. I further told Carol that she had her salary review in June, 1969 and Gary had his in August 1969—I told her if she had waited until her next review date her salary would be brought into line, but we don't go around changing everyone elses salary when we give one individual a raise. I also told her that it's un-fortunate that she doesn't know the other salaries in the de-partment because if she did she would realize that her salary is not out of line. She disagreed at this point because she feels that she deserves $600.00 regardless of what others are making.

11. I believe the issue of the time card is really what got Carol going on the complaint about the salary. She had the impres-sion from Norton Johnston during her June, 1969 review that she would be removed from the time card November 1, 1969.

I told her that Norton agreed to review the possibility of going on straight salary effective November 1st, and when the suspense came up I decided that January 1, 1970 would be a more appropriate date to make this change since she had more than exhausted her forty hours of sick-time during 1969. On January 7th she asked me if she had been removed from the time card effective January 1st and I advised her that McLaughlin had decided to postpone his decision until he had an opportunity to review the absence situation of the entire department during 1969.

12. In closing it should be mentioned that Gary handles a larger premium territory than does Carol. In addition, in a phone conversation with Bill Fox (Salesmanager of the Service Office Carol handles work for) on January 13, 1970 Bill asked if something could be done with Carol because he felt the handling of his territory has never been so poor in the past as it has been since Carol started handling his business.

My own personal opinion is that Carol is an excellent worker, even a perfectionist to some extent, when it comes down to working with known facts—like following set procedures from a manual. But when it comes down to the abstract or elementary aspects of a situation, Carol is lost. I don't know if her intelligence is so high that she is unable to see the simple and elementary facts, or just what the problem is. Her work was excellent on both the Auto and Workmen's Compention Assigned Risk Desk—everything was in writing and she read the manuals well. She was also good on the Allied Agents, but again this was a set procedure.

Bill Fox says she is good in writing memos but she never tells him what he wants to know—she's on some other wave length. Retrospective rating is abstract, and I've noticed when she is asked to work up quotations she always presents facts—straight formula rates—no abstract thinking.

Since last summer (1969) Carol has displayed the feeling that she is all perfect—everyone else around her is inferior—fellow employees, people of Dallas, and society in general. I noticed a great change in Carol and her husband take place last summer and since that time almost all personal friendship has disappeared. She and her husband reached the point of being critical about almost everything around them, and yet they did nothing to correct the problem.

(s) William C. Davis
William C. Davis
Underwriting Supervisor