EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

H. S. CAMP & SONS, INC., Defendant.

No. 77–69–Civ–Oc.

United States District Court, M. D. Florida, Ocala Division.

June 1, 1982.

412

William H. Phelan, Jr., Willard Ayres, Ocala, Fla., for plaintiff.

John Marshall Meisburg, Jr., Senior Trial Atty., James D. Keeney, Supervisory Trial Atty., Equal Employment Opportunity Commission, Miami, Fla., William L. Robinson, Associate General Counsel, Equal Employment Opportunity Commission, Washington, D. C., Michael R. Lefkow, Chicago, Ill., for defendant.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

The Equal Employment Opportunity Commission ('EEOC') brought this class action against H. S. Camp & Sons, Inc. ('H.S. Camp') alleging racial and sexual discrimination in defendant's employment practices in violation of Section 703(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a) (1981) (hereinafter 'Title VII'). Plaintiff seeks a permanent injunction enjoining defendant from engaging in discriminatory employment practices based upon race and sex, an order requiring defendant to institute an affirmative action program to eradicate the effects of the alleged past unlawful employment practices, and backpay, with interest, for those members of the class adversely affected by the alleged discriminatory practices.

## PROCEDURAL HISTORY

On August 27, 1974, Patty Coffie filed a charge of employment discrimination with EEOC against H.S. Camp. (Ex. 16). Ms. Coffie, a black employee, alleged that she was discharged by H.S. Camp because of

her race and sex. Following an investigation of the charge, EEOC determined that there was reasonable cause to believe Ms. Coffie's discharge was racially motivated. (Ex. 1). EEOC further concluded that there was reasonable cause to believe that H.S. Camp engaged in classwide discrimination against black and female employees. (Ex. 1).

H.S. Camp declined EEOC's invitation to conciliate, and EEOC commenced this action on November 30, 1977. EEOC alleges that since July 2, 1965, H.S. Camp has continuously and intentionally engaged in unlawful employment practices in violation of Section 703(a) of Title VII. Specifically, EEOC claims that such unlawful employment practices include failing to hire black and female applicants because of their race and sex, maintaining segregated departments on the basis of race and sex, assigning black and female employees to jobs on the basis of race and sex, failing to promote black and female employees because of their race and sex, and discharging Patty Coffie because of her race and sex.

During the trial, EEOC moved for permission to file a supplemental complaint including a claim of retaliation, in violation of Section 704(a) of Title VII, by H.S. Camp against a white female employee who had contacted EEOC. The Court denied this motion, although evidence of the alleged retaliation was admitted in support of EEOC's claims under Section 703(a) of Title VII.

EEOC also filed a motion to amend the complaint to conform to the evidence seeking to include the following claims:

1. That defendant has continuously, from July 2, 1965 up until the present time, failed or refused to post EEOC posters in a conspicuous place on its facility in violation of Section 711(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*

2. That defendant has wilfully failed or refused to post EEOC posters on its facil-

ity, after notice, from at least March 1, 1975 to the present time, in violation of Section 711(b) of Title VII.

3. That defendant has continuously, from July 2, 1965, up until the present time, maintained racially segregated restroom facilities in violation of Title VII of the Civil Rights Act of 1964, Section 703(a)(1) thereof.

4. That the defendant has continuously from July 2, 1965 up until the present time, paid less wages to female employees than to male employees on account of their sex for equal or comparable work, in violation of Section 703(a)(1) of Title VII.

5. That defendant has continuously from July 2, 1965 up until the present time, discharged Black employees due to their race, in violation of Section 703(a)(1) of Title VII.

6. That defendant has continuously from July 2, 1965 up until the present time, paid blacks less wages than white employees for the same or comparable work and jobs due to their race, in violation of Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*

The Court granted plaintiff's motion to amend the complaint to conform to the evidence with respect to the claim of failing to display EEOC posters but denied the motion with regard to the allegations of classwide discrimination in setting wages and discharging employees since July 2, 1965. The allegation of maintaining racially-segregated restroom facilities had been properly set forth in previous pleadings and, therefore, the motion to amend the complaint to include that claim was stricken.[1]

■ Upon reconsideration, the Court finds that the claims of discharging black employees because of their race and paying black and female employees lower wages because of their race and sex were litigated with the implied consent of the parties.

---

1. The Court noted that the claim of racially segregated restrooms had been set forth in EEOC's pretrial brief and that an amendment to the complaint was, therefore, technically unnecessary, even though this claim was not contained in the original or amended complaint.

These allegations were set forth in plaintiff's trial brief and in the joint amended pretrial stipulation, although they were limited to the time period from August 15, 1974 until the present. Evidence was admitted at trial concerning these claims without objection. Moreover, H.S. Camp introduced evidence on the issue of classwide discrimination in setting wages and vigorously cross-examined EEOC's expert statistician with regard to his analysis of H.S. Camp's discharging practices. Consequently, the order entered on June 9, 1980 will be modified and plaintiff's motion to amend the complaint to conform to the evidence will be granted pursuant to Rule 15(b) of the Federal Rules of Civil Procedure with respect to EEOC's classwide claims of discrimination in setting wages and discharging employees for the period from August 15, 1974 until the present.

EEOC filed a second motion to amend the complaint to include a claim of discrimination against black employees because of their race in the terms, conditions and privileges of employment. The Court granted this motion.

This action was certified as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure [2] and the trial of the issues of liability and damages was bifurcated. Following completion of the liability proceedings, EEOC moved to decertify the case as a class action. In support of its motion, plaintiff cited *General Telephone Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), decided during the trial of the issue of liability, in which the Supreme Court held that EEOC is not required to comply with the procedural requirements of Rule 23 when seeking classwide relief pursuant to its authority under Section 706 of Title VII of the Civil Rights Act of 1964. Concluding that retrospective decertification was not required by *General Telephone Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission, supra*, this Court denied plaintiff's motion to decertify the class action with respect to the proceedings on the issue of liability. However, plaintiff's motion to decertify the class action with regard to all further proceedings was granted.

Having completed the proceedings on the issue of liability, the Court now enters its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### Background

H.S. Camp is a family owned corporation which operates a slaughtering and meat-processing plant in Oak, Florida. The company was founded in 1935 and incorporated in 1961. (R. 1364). H.S. Camp employs between 80 and 90 employees including many members of the Camp family. (R. 1364).

The management of H.S. Camp consists of executive managers and department supervisors. (Ex. 14). The executive managers are all members of the Camp family and include: Donald G. Camp, sales and merchandising; Mark D. Camp, manufacturing and maintenance; Dennis D. Camp, personnel administration and shipping;

2. The order certifying this case to be maintained as a class action defined the class as follows:

All past, present, and future black applicants and female applicants who have not been (are not) (will not be) hired by defendant because of their race or sex;
All past, present, and future black employees and female employees in all job classifications within defendant's facility located in Oak, Florida;
All past, present, and future black employees and female employees who have been (are)

(will be) assigned to certain job classifications because of their race or sex at defendant's facility in Oak, Florida;
All past, present, and future black employees and female employees who have been (are) (will be) assigned to certain departments because of their race or sex at defendant's facility in Oak, Florida; and
All past, present, and future black employees and female employees who have not been (are not) (will not be) promoted because of their race or sex at defendant's facility in Oak, Florida.

Glenn S. Camp, livestock purchasing; Mark L. Camp, controller and office manager; Randall M. Camp, meat processing and inventories. Each department is managed by a supervisor who reports to the executive managers.

H.S. Camp is comprised of 13 departments which include: slaughtering, meat processing, meat cutting, sausage, smoked meats, packing, shipping, receiving and inventory, delivery, maintenance, custodial, clerical and sales. (Ex. EE). The nature of the work performed and the qualifications required for the positions in each department must be reviewed in order to properly analyze H.S. Camp's employment practices.

The slaughter department or "kill floor" is where the cows and hogs are slaughtered, skinned, cleaned and prepared for further processing.[3] Although the carcasses are raised by an electric hoist which is attached to an overhead trolley system, employees must push the carcasses which weigh from 150 to 2500 pounds along the trolley track to the different stations within the department. (R. 2323, 2333, 2343). There is a strong, pungent odor in the kill floor area during the slaughtering of the animals and a substantial amount of blood and animal tissue covers the floor. (R. 2326, 2330). The employees are often splattered with blood and fatty tissue from the animals and, therefore, must wear rubber boots and aprons. (R. 2306, 2309, 2318). Most of the knives used in processing the carcasses have a six-inch blade and are kept extremely sharp. (R. 2310). Employees who work in the slaughter department are required to wear hand guards, arm guards and hard hats for protection. (R. 2309).

The employees clean the slaughtering area twice a day. The floors are swept, all blood and animal tissue is removed, and all equipment and machinery is thoroughly cleaned. (R. 2275a). In addition to cleaning the kill floor, the sewage disposal system must be inspected and cleaned periodically. A drainage system connects the kill floor with waste ponds located outside the plant. (R. 2366). The blood from the animals flows through the sewage disposal system into the waste ponds. A settling tank collects the large solid pieces of waste that would clog the drainage system. Employees from the slaughter department are selected by the department supervisor to empty the settling tank with buckets. (R. 2284a). This job is commonly referred to as "dipping the hole" and is normally performed at the end of the day on Friday. (R. 2285a–86a, 2288a). The employees who perform this job generally are allowed to leave work approximately one hour earlier than other slaughter department employees because after "dipping the hole" the employees are unable to work in the slaughtering area unless they have thoroughly cleaned themselves of the waste material. (R. 2288a, 2289a).

The entry level position in the slaughter department requires no particular education, skill or experience. (R. 1537). However, employees in the slaughter depart-

---

**3.** The animals are driven with an electric prod from the holding pens outside the plant into a chute which leads to the "knocking box". (R. 2297-98). Once inside the knocking box, the animal is stunned by a projectile fired from a stunning device. (R. 2298). The animal then falls through a trapdoor onto the kill floor where it is shackled and raised by an electric hoist which is attached to an overhead trolley system. (R. 2299). The trolley system is approximately 17 feet off the floor and the animals, weighing from 1,000 to 2,500 pounds, are hung by their hind legs so that their heads are three or four feet from the floor. (R. 2300–01, 2323).

The stunned animal is then bled by severing an artery in the neck. (R. 2302–03). The legs and head of the animal are removed and the head is inspected for disease. (R. 2307–12). Next, the internal organs are removed and transported in a large barrel-shaped container on wheels called a "gut buggy" to an inspection station where they are inspected for disease. (R. 2312–25). Some of the internal organs such as the liver and heart are placed in a refrigerated room. The carcass is then lowered onto a cradle where two employees remove the hide. (R. 2316). The hides are salted and stored in the hide cellar. (R. 2244a, 2277a). While the carcass is still in the cradle, the rib cage is split with a hand saw. (R. 2317). The carcass is then scalded and cleansed. Finally, the carcass is weighed and stamped, and pushed along the trolley system into one of the refrigerated rooms.

ment must be able to push the heavy carcasses along the trolley system. (R. 2323, 2333, 2343).

In the meat processing department the carcasses are cut into primal cuts such as loins and rounds and the bones are removed from the boneless cuts. (R. 1475). Each carcass at this stage weighs between 150 and 250 pounds and must be lifted off the trolley system and placed on a cutting table. (R. 2343). The primal cuts weigh between 15 and 30 pounds and are transported in stainless steel barrels to the meat cutting department. (R. 2351). The barrels are on wheels and weigh between 3,000 and 4,000 when full. (R. 2350). Generally, it takes two to three persons to push the barrels. (R. 2350). There are no education, skill or experience requirements for the entry level position in the meat processing department. (R. 1534). However, employees in this department must be able to lift the carcasses and push the barrel containing the primal cuts.

The primal cuts are taken to the meat cutting department where a tenderizing machine punctures the meat with needles. (R. 2354). Individual steaks and roasts are then cut with an electric band saw. (R. 2356). After the meat is trimmed, it is placed in a tenderizing solution. (R. 2357). The individual cuts of meat are then wrapped in cellophane by a meat wrapping machine and labeled. (R. 2359). The entry level job for the meat cutting department requires no particular skill, education or experience, other than the ability to read and write sufficiently to prepare the labels. (R. 1532).

Sausage, weiners and sandwich meat are prepared in the sausage department. (R. 1476). Large chunks of meat are cut and ground by a machine called the chopper. (R. 2367–68). In operating the chopper, chunks of meat are placed in a cone-shaped container that is four to five feet tall and weighs approximately 400 pounds when full. (R. 2369–72). The cone-shaped container is raised by an electric hoist and pushed along a trolley track until it is directly over the chopping machine. The bottom of the cone-shaped container is pulled open and the meat falls into the chopper. (R. 2371). Because there is a substantial amount of pressure on the bottom of the cone-shaped container from the weight of the meat, it takes a considerable amount of strength to open the bottom of the container once the container is over the chopper. (R. 2372). After the meat is chopped and ground, it is placed in a machine called the mixer which mixes the ground meat with seasonings. (R. 2372). The meat is again placed in a large, cone-shaped container, lifted by an electric hoist and pushed along the trolley system over a machine called the stuffer. (R. 2373). The bottom of the container is pulled open and the meat falls into the stuffer. (R. 2374). This container also weighs approximately 400 pounds when full and, therefore, is also very difficult to open when full. (R. 2374). Even when the bottom of the container is open, some of the meat often clings to the side of the container and an employee must shake the container so that all of the meat falls into the stuffer. (R. 2374). The stuffer forces the meat into the sausage and weiner casings while another machine called the frank-o-matic cuts and links the sausage or weiners. (R. 2375). The sausage and weiners are then hung on a rack called a "tree". (R. 2378). Some of the racks are attached to an overhead trolley system while the older racks have wheels and are rolled along the floor. (R. 2385). When the rack is full it weighs approximately 600 pounds. (R. 2379). The rack is pushed along the trolley track to the smoked meat department which is a subdivision of the sausage department. (R. 2380). After the sausage and weiners have been smoked, they are placed in a refrigerated room. (R. 2380).

There is no skill, education or experience required for the entry level position in the sausage department. However a considerable amount of physical strength is necessary in order to operate the machines and transport the meat.

The products from the meat cutting and sausage departments are taken to the packing department where they are wrapped,

packaged in boxes, and labeled. (R. 1477). The boxes weigh from 80 to 90 pounds and must be transported into the storage rooms. (R. 2549). The positions in the packing department do not require any particular skill, education or experience. However, employees in the packing department must be able to lift the boxes of meat and must possess the ability to read and write sufficiently to prepare the labels.

The receiving and inventory department is where the products purchased from other food processing companies are delivered. (R. 2421–22). The products are in boxes weighing anywhere from five to 2,000 pounds and must be unloaded from the delivery trucks. (R. 2423). The boxes are raised by a hydraulic jack which is on wheels and pushed into the storage rooms. (R. 2424). Each employee in the receiving and inventory department moves approximately 19,330 pounds per day. (R. 2424). Consequently, the positions in this department require a substantial amount of physical strength. Although no skill or experience is required for the entry level position in the receiving and inventory department, a high school education is preferred. (R. 1544).

Employees of the shipping department work at night. They are responsible for loading the items listed on the sales invoices onto the refrigerated trucks. (R. 1478). The boxes that are loaded onto the trucks weigh between 80 and 100 pounds. (R. 2528). Quarters of beef weighing from 100 to 300 pounds are also loaded onto the trucks. (R. 2528). The entry level position in the shipping department requires no particular skill or experience, although a high school education is preferred. (R. 1545). Shipping department employees, however, must be able to lift the heavy boxes and quarters of beef.

The delivery department consists of five truck drivers. (R. 2533). The trucks normally carry from 10,000 to 20,000 pounds and each delivery route is approximately 250 miles round trip. (R. 2533–34, 2537). The truck drivers make the deliveries alone and are required to unload the products which include heavy boxes and quarters of beef. (R. 2539–40). The entry level position in this department requires a chauffeur's license and some skill in operating a large truck. (R. 1538–39). In addition, the truck drivers must be strong enough to unload the trucks unassisted.

The employees in the sales department take wholesale orders and assist the customers in maintaining an appropriate supply of H.S. Camp products. (R. 1478). The sales personnel must ensure that the products are being displayed properly and that the customers' inventory of H.S. Camp products is being rotated. (R. 2542). There are six employees in the sales department. (R. 2543). The employees in this department must have a general knowledge of the meat packing business and be able to determine the quality of a piece of meat. (R. 2543–44). Furthermore, a sales person must have a high school education and be able to drive an automobile. (R. 1543).

The clerical department employees are in charge of customer accounts, invoices, billing, payroll and all personnel records. (R. 1481). The positions in the clerical department include bookkeeper, payroll clerk, receptionist and key punch operator. (R. 1528). Typing skills are required in this department and a high school education is preferred. (R. 1529).

The employees in the maintenance department are responsible for maintaining the building, trucks and equipment. (R. 1479). There are generally only two maintenance employees, a mechanic and a foreman. (R. 1540). They must be skilled in maintaining electric, hydraulic and refrigeration equipment and machinery. (R. 1541).

The custodial department employees clean those areas of the plant that are not maintained by other departments. (R. 1480). There is no skill, education or experience required for a custodial position.

*Hiring*

The parties used two methods of statistical analysis in analyzing the hiring practices

of H. S. Camp. Under the applicant flow analysis, the percentage of blacks and women who were hired was compared with the percentage of blacks and women who submitted applications. Because the applications submitted prior to 1978 were not preserved by H. S. Camp, the composition of the applicants during the period from 1965 through 1977 could not be determined.[4] (R. 1437–39). The static analysis method compared the number of blacks and women employed on various randomly-selected dates with the number of blacks and women expected to be employed based upon the percentage of blacks and women in the relevant labor market.

Dr. Howard S. Gitlow, EEOC's expert statistician, determined that during 1978 and 1979, 360 persons submitted employment applications to H. S. Camp, including 169 whites, 93 blacks and 98 persons whose race could not be determined. (R. 287–88). No evidence was produced concerning the qualifications of these applicants. Dr. Gitlow testified that one could reasonably assume that the racially unidentified applicants were of the same racial composition as the group whose race was known. (R. 289–90). Based on this assumption, Dr. Gitlow concluded that 35.5 percent of the ap-

plicants during those two years were black. (R. 289).

■ Dr. Gitlow was only able to obtain data on the persons hired by H. S. Camp from 1976 through 1978. During this period, H. S. Camp hired 204 persons, including 172 whites and 32 blacks.[5] Because applicant data was unavailable for 1976 and 1977, it was necessary to assume that the percentage of black applicants in 1976 and 1977 was the same as the percentage of black applicants in 1978 and 1979 to obtain an applicant flow analysis for the period from 1976 through 1978.

Although Dr. Gitlow prepared this applicant flow data, he did not actually conduct an applicant flow analysis. (R. 287–89, Ex. 216). However, counsel for EEOC presented Dr. Gitlow's data to Dr. Richard L. Scheaffer, H. S. Camp's expert statistician, in the form of a hypothetical question on cross-examination. (R. 3013–14). Based upon Dr. Gitlow's figures, Dr. Scheaffer determined the difference between the expected and observed number of black employees to be 39 or approximately 5.78 standard deviations.[6] (R. 3015).

Dr. Gitlow did perform an applicant flow analysis of the hiring of women at H.S. Camp. In 1978 and 1979, 21.4 percent or 77 of the 360 applicants were women.[7] (R.

---

4. EEOC filed a motion for the imposition of a sanction in the form of an "adverse inference" against H.S. Camp for failure to produce the application forms submitted prior to August 1, 1978. The Court denied this motion, noting that the "adverse inference rule" applies only when a party fails to produce relevant evidence that is within its control. The Court further found that there was considerable doubt whether H.S. Camp was actually aware at the time that the application forms were destroyed that it was required to preserve all application forms, and that the evidence established that the applications filed prior to August 1, 1978 were disposed of in accordance with defendant's reasonable business practice.

5. Four persons hired from 1976 through 1978 were members of the Camp family. (R. 1463–68). Although nepotism by itself is not violative of Title VII, it is prohibited when it results in discrimination. *Gibson v. Local 40, Supercargoes & Checkers, etc.*, 543 F.2d 1259, 1268 (9th Cir. 1976); *Domingo v. N.E.F.C.O.*, 445 F.Supp. 421, 436 (W.D.Wash.1977). Nepotism,

therefore, is not a proper defense to a charge of discrimination. Consequently, the Court will not consider the hiring of members of the Camp family in weighing the statistical evidence.

6. Dr. Scheaffer determined the degree of statistical disparity in standard deviations using the following formula:

$$\text{one standard deviation} = \sqrt{\substack{\text{total} \\ \text{number of} \\ \text{employees} \\ \text{observed}} \times \substack{\text{percentage} \\ \text{of black} \\ \text{employees} \\ \text{expected}} \times \substack{\text{percentage} \\ \text{of white} \\ \text{employees} \\ \text{expected}}}$$

$$\substack{\text{disparity} \\ \text{measured in} \\ \text{standard} \\ \text{deviations}} = \substack{\text{number of} \\ \text{black} \\ \text{employees} \\ \text{observed}} - \substack{\text{number} \\ \text{of black} \\ \text{employees} \\ \text{expected}} \div \substack{\text{one} \\ \text{standard} \\ \text{deviation}}$$

(R. 2916–37).

7. Dr. Gitlow's statistical analyses of the hiring of women at H.S. Camp is summarized in the following chart:

302). Of the 204 persons hired from 1976 through 1978, 15 were female, 182 were male and the sex of seven persons was not available. (R. 315, Ex. 26). Rather than using the percentage of women hired from 1976 through 1978, Dr. Gitlow utilized the percentage of women employed by H.S. Camp on March 19, 1975, February 1, 1980, and five intermediate randomly-selected dates. (R. 302, 304, Ex. 26). Because applicant data was not available for 1975 through 1977 and 1980, it was necessary for Dr. Gitlow to assume that the percentage of female applicants during those years was equal to the percentage of female applicants in 1978 and 1979. Dr. Gitlow concluded that his analysis demonstrated a "very strong statistical disparity". (R. 301–03). However, as will be discussed *infra*, Dr. Gitlow's determination of the total number of employees employed by H.S. Camp on the randomly-selected dates is inaccurate.

Both EEOC and H.S. Camp conducted static analyses of H.S. Camp's hiring practices from 1975 through 1980. In applying the static analysis method, the relevant labor pool must be determined. The parties have stipulated that the most appropriate geographical area for determining the labor pool from which H.S. Camp hires its employees is Marion County, Florida where the H.S. Camp plant is located.

Dr. Beth Niemi, EEOC's expert labor economist, testified that the 1970 United States census Food and Kindred Products subclassification of the Civilian Labor Force of Marion County would be the most accurate measurement of H.S. Camp's labor pool. (R. 114–21). She further stated that the 1970 census Civilian Labor Force of Marion County would be an appropriate alternative measurement. (R. 87, 91). Based upon the 1970 United States census, 24.8 percent of the persons within the Food and Kindred Products subclassification of the Civilian Labor Force of Marion County were black, while 24 percent of the persons within the Civilian Labor Force of Marion County were black. (R. 87, 91, Ex. 37).

Dr. Stanley K. Smith, H.S. Camp's expert economist, testified that an extremely high correlation exists between the Civilian Labor Force classification of the 1970 census and the work force population, which includes all persons between the ages of 15 and 64. (R. 2200). He further stated that the percentage of blacks in Marion County has substantially declined since 1970. (R. 2207). Because of the close correlation between the work force population and the Civilian Labor Force classification, Dr. Smith concluded that the most appropriate measurement of H.S. Camp's labor pool would be the number of persons between 15 and 64 years of age within Marion County during the relevant period of time. (R. 151–55, 2219). From 1974 through 1978, 16 to 17 percent of all persons between 15 and 64 years of age within Marion County were black. (R. 2219, 2244–45).

Although the 1970 census was undoubtedly the most accurate measurement of H.S. Camp's labor force in 1970, it is to some extent outdated for use from 1975 through

| Date | Total Employees | Female Employees Observed | Female Employees Expected Civilian Labor Force 39.82% | Female Employees Expected Food and Kindred Products 30.62% | Applicant Data Female Employees Expected 21.4% |
|---|---|---|---|---|---|
| 3–19–75 | 80 | 11 | 31.4 | 24.5 | 17.2 |
| 10–3–75 | 123 | 10 | 48.0 | 37.6 | 26.3 |
| 3–12–76 | 90 | 8 | 35.4 | 27.5 | 19.3 |
| 5–14–76 | 81 | 7 | 31.8 | 24.8 | 17.3 |
| 5–21–76 | 83 | 8 | 32.6 | 25.5 | 17.8 |
| 9–6–78 | 139 | 23 | 54.6 | 42.5 | 29.8 |
| 2–1–80 | 80 | 15 | 31.4 | 24.5 | 17.0 |

1980 in view of the decline in the percentage of blacks in Marion County since 1970. However, it is also clear that although the work force population from 1974 through 1978 may be a more current measurement of H.S. Camp's labor pool, it is based upon an estimate rather than an actual count such as the census. The Court finds that neither measurement is clearly superior. However, the Court further finds that both measurements are relevant in determining the racial and sexual composition of H.S. Camp's labor pool during the period in question. Consequently, the Court will accord equal evidentiary weight to statistical analyses based upon either the 1970 census or the 1974–1978 work force population.

Dr. Gitlow employed the 1970 census Civilian Labor Force of Marion County as the relevant labor pool in his static analysis of H.S. Camp's hiring practices with respect to blacks. To obtain a sample of employees at H.S. Camp, Dr. Gitlow used the number of employees employed on March 19, 1975, February 1, 1980, and five intermediate randomly-selected dates.[8] (R. 280–85). However, in calculating the total number of employees on each date, Dr. Gitlow used the computerized payroll records which listed the year-to-date earnings of each employee. (R. 285). Because the payroll records listed the year-to-date earnings, employees who had been terminated earlier in the year were listed even though they were no longer working at H.S. Camp. (R. 3143–45). Consequently, in determining the total number of employees on each date, Dr. Gitlow included some employees who had been terminated earlier in the year and were no longer employed by H.S. Camp. (R. 380–88).

Dennis Camp, the director of personnel at H.S. Camp, reviewed the personnel files to determine the correct total number of employees and the number of black employees on the dates selected by Dr. Gitlow. (R. 3144–45). The following chart indicates the difference between the expected and the observed number of black employees employed at H.S. Camp on the randomly-selected dates, as determined by Dennis Camp, based upon both the Food and Kindred Products subclassification of the 1970 census and the work force population from 1974 through 1978:[9]

| Dates | Total Employees | Black Employees Observed | Black Employees Expected Food and Kindred Products Subclassification 24.8% | Standard Deviations | Black Employees Expected Work Force Population 17% | Standard Deviations |
|---|---|---|---|---|---|---|
| 3–19–75 | 80 | 11 | 19.8 | 2.28 | 13.6 | .77 |
| 10–3–75 | 93 | 7 | 23 | 3.85 | 15.8 | 2.43 |
| 3–12–76 | 89 | 10 | 22.1 | 2.97 | 15.1 | 1.45 |
| 5–14–76 | 83 | 7 | 20.6 | 3.46 | 14.1 | 2.08 |
| 5–21–76 | 80 | 6 | 19.8 | 3.58 | 13.6 | 2.26 |
| 9–6–78 | 88 | 12 | 21.8 | 2.42 | 15 | .85 |
| 2–1–80 | 86 | 15 | 21.3 | 1.58 | 14.6 | −.11 |

Dr. Gitlow also analyzed the hiring of women by means of the static analysis method using the percentage of women employed on the randomly-selected dates.[10]

8. Dr. Gitlow's static analysis of the hiring of blacks at H.S. Camp is summarized in the following chart:

| Date | Total Employees | Black Employees Observed | Black Employees Expected Civilian Labor Force | Probability of Such Disparity |
|---|---|---|---|---|
| 3–19–75 | 80 | 9 | 19.2 | .6% |
| 10–3–75 | 123 | 15 | 29.5 | .2% |
| 3–12–76 | 90 | 12 | 21.6 | 2.0% |
| 5–14–76 | 80 | 10 | 19.2 | 2.0% |
| 5–21–76 | 82 | 9 | 19.7 | .5% |
| 9–6–78 | 143 | 17 | 34.0 | .05% |
| 2–1–80 | 80 | 15 | 19.2 | 17.0% |

9. The statistical disparities measured in standard deviations was calculated based upon the formula employed by H.S. Camp's expert statistician, Dr. Richard Scheaffer. See n. 6 *supra*.

10. *See* n. 7 *supra*.

As previously noted, however, Dr. Gitlow's calculation of the total number of employees employed at H.S. Camp on the randomly-selected dates was inaccurate. Although the total number of employees on the randomly-selected dates was correctly determined by Dennis Camp, there is no evidence to corroborate Dr. Gitlow's calculation of the number of women employed on those dates.

EEOC also introduced nonstatistical evidence concerning H.S. Camp's hiring practices. As director of personnel, Dennis Camp reviews the written applications submitted by applicants for a position with H.S. Camp. (R. 3070). After reviewing the applications, Mr. Camp interviews the applicants who appear to be qualified for a position and determines which applicants to hire. (R. 3070). Mr. Camp testified that female applicants often withdraw their applications after learning of the nature of the work at H.S. Camp. (R. 3071, 3075).

In March 1979, Edward Taylor, a black male, applied for a job as a truck driver with H.S. Camp in response to an advertisement in a local newspaper, but was not hired. (R. 18–20). The advertisement described the position as "Delivery worker on meat truck, will train. Chauffeur's license and 21 years of age required." (Ex. 36). When Mr. Taylor filed his application he was over 21 years of age, 6'1" tall, weighed 182 pounds, possessed a chauffeur's license and had completed three years of college. (R. 2124). Mr. Taylor had some experience in the meat packing business and as a truck driver. (R. 25–26).

After Mr. Taylor submitted his written application, he was interviewed by Dennis Camp. Dennis Camp testified that Mr. Taylor read a newspaper during the interview while Mr. Camp was asking him questions. (R. 1722). Mr. Taylor testified that he only briefly referred to the job advertisement in the newspaper when Mr. Camp accepted a telephone call during the interview. (R. 3442). During the interview, Mr. Taylor indicated that he was going to attend night school. (R. 1723). Dennis Camp noted that attending school at night would conflict with the working hours required for the job. (R. 1723). Philip Ward, a white male who had 12 years of shipping and delivery experience, was hired for the position. (R. 1723–24). The Court finds that Dennis Camp did not refuse to hire Mr. Taylor because of his race but rather based his decision on Mr. Taylor's potential conflict with the working hours at H.S. Camp and Mr. Ward's superior qualifications.

In 1976, Eddie F. McNeil, a black male, applied for a job at H.S. Camp. (R. 1070–71). Mr. McNeil weighed 195 pounds and was 6'1" tall. (R. 1072). He had completed high school and some college courses at the time of his application. (R. 1067). Mr. McNeil filled out a written application at the H.S. Camp plant and later was told that the company was not hiring at that time. (R. 1071). The Court finds that Mr. McNeil was not hired because no vacancies existed at the time of his application and that his race was not a factor in the decision not to hire him.

Rose P. Powers, a white female applied for a position at H.S. Camp in June, 1979. (R. 60). She was 5'6" tall and weighed 165 pounds at the time of her application. (R. 63). In her prior job she lifted air conditioners with the assistance of other employees. (R. 63). Ms. Powers testified that in September of 1979 a friend who was employed by H.S. Camp informed her that there was a job opening. (R. 61). Ms. Powers further testified that during her interview with Dennis Camp he told her that there was an opening in the sausage department and that she should come back on the following Monday to fill out a W–2 form. (R. 61). Ms. Powers stated that when she returned to fill out her W–2 form, Dennis Camp said that a relative had arrived in town and that the job had been filled. (R. 61–62). Dennis Camp denied hiring a relative to fill the position for which Ms. Powers had applied. (R. 1719). Ms. Powers subsequently visited the H.S. Camp plant on numerous occasions seeking employment but was never hired. (R. 62). No evidence was produced with regard to the basis of H.S. Camp's decision not to hire Ms. Powers.

Candace M. Tharp and Tina L. Cochran, both white females, applied for a job at H.S. Camp in August of 1978. (R. 163–181). Ms. Tharp and Ms. Cochran previously worked .for a company cleaning mobile homes and were required to move refrigerators, stoves and furniture. (R. 165–182). Ms. Tharp and Ms. Cochran expressed interest in the meat wrapping and packing positions at H.S. Camp. (R. 164–182). However, at the time of their applications the only position available was in the shipping department. (R. 17–18). Dennis Camp did not hire Ms. Tharp and Ms. Cochran because he did not think that they were strong enough to work in the shipping department. (R. 1718–19). Mr. Camp further stated that if either a meat wrapping or packing position had been available, Ms. Tharp or Ms. Cochran probably would have been hired. (R. 1718). Dennis Camp retained the applications of Ms. Tharp and Ms. Cochran for a year. (R. 1732). The Court finds that Dennis Camp did not refuse to hire Ms. Tharp and Ms. Cochran because of their sex but rather based his decision on the unavailability of a position for which they were qualified.

### Job Assignments and Transfers

Most of the black employees at H.S. Camp hold positions in the slaughter, meat processing, meat cutting, sausage, packing, and custodial departments. (R. 2294a, Exs. 26, LL, MM, NN, OO and PP). Black employees have never been assigned to the clerical or sales departments. (R. 1710–11). From 1975 through 1980 several vacancies existed in those departments in which few, if any, black employees were employed. (Exs. LL, MM, NN, OO and PP). Dennis Camp testified that H.S. Camp had never received an application from a black person for a position in the sales department. (R. 1711). He further stated that only one black person had applied for a clerical position and that at the time of the application there were no vacancies in the clerical department. (R. 1711).

Dr. Gitlow, EEOC's expert statistician, determined the number of black employees assigned to each department on March 19, 1975, February 1, 1980, and five intermediate randomly-selected dates. (R. 321). On the dates selected, no black employees were employed in the clerical, delivery, maintenance, sales, receiving or shipping departments. (R. 321).

Dr. Richard Scheaffer, H.S. Camp's expert statistician, analyzed H.S. Camp's departmental assignment of black employees in 1975 and 1980 using a confidence interval analysis. (R. 2949–67). Under this method, a confidence interval is constructed based upon the racial composition of the sample of employees in each department. (R. 2955–59). There is a 95 percent chance that the actual percentage of blacks in the relevant labor pool would fall within the confidence interval selected. (R. 2955–59). Consequently, if the percentage of blacks in the relevant labor pool is within the confidence interval selected, it is assumed that the blacks were randomly assigned to the various departments. (R. 2956). Because of the small sample sizes involved, the confidence interval technique is more accurate than the standard deviation analysis in analyzing departmental assignments. (R. 2941–43, 2967–68). Dr. Scheaffer determined confidence intervals for each department in 1975 and 1978 using data that EEOC had obtained from H.S. Camp's personnel records. (R. 2941, Exs. XX, YY, ZZ and AAA). Based upon a relevant labor pool containing 24 percent blacks, as measured by the 1970 census Civilian Labor Force of Marion County classification, or 17 percent blacks, as measured by the work force population of Marion County from 1974 through 1978, Dr. Scheaffer concluded that H.S. Camp had randomly assigned employees to departments in 1975 and 1978. (R. 2955–56). However, assuming that the relevant labor pool contained 35 percent blacks, as estimated by the applicant flow data for 1978 and 1979, Dr. Scheaffer concluded that it was highly unlikely that the employees were randomly assigned to departments (R. 2958).

Monroe Leahmon, a black employee, worked in the slaughter department for approximately 15 years and retired in 1976.

(R. 729–30). While working in the slaughter department, Mr. Leahmon developed a nervous condition. (R. 730). Because of his nervous condition, Mr. Leahmon asked Mark Camp for a transfer from the slaughter department. (R. 730). Mr. Camp replied: "Old Man, you're going to die on the kill floor." (R. 731, 2577). Mark Camp testified that he explained to Mr. Leahmon that if he were to transfer to another department, he would receive a cut in pay because he would not be as qualified for a position in another department. (R. 2578). Mark Camp further stated that his response to Mr. Leahmon's request was merely part of a long-standing joke and that he and Mr. Leahmon understood that Mr. Leahmon did not really want a transfer because it would result in a decrease in pay. (R. 2578–79). No further evidence was introduced concerning the basis for the denial of Mr. Leahmon's transfer request.

John L. Clark, a black employee, worked for 15 years in the slaughter department holding various jobs including removing internal organs, skinning cows and scalding hogs. (R. 773–74). Mr. Clark testified that he never really wanted to leave the slaughter department because he liked working there. (R. 774). However, he stated that he once asked to be transferred because he did not like Herman Cole, a white male who was the supervisor of the slaughter department. (R. 774–75). Mr. Clark explained that Mr. Cole would blame him when others were at fault, made it difficult for him to take days off, and often assigned him the job of "dipping the hole". (R. 775–76). Mr. Clark often drank excessively and sometimes came to work with a hangover. (R. 787, 794, 2837). Mr. Cole once saw Mr. Clark drinking in the restroom at work and sent Mr. Clark home from work one day when he was skinning cows and appeared to be intoxicated. (R. 2838–40).

Ernest Dickerson, a black employee, worked in the slaughter department slaughtering hogs. (R. 191). While working in the slaughter department, Mr. Dickerson developed a blister on his hand which became infected. (R. 191). A physician treated the infection and specified that Mr. Dickerson was not to handle or be near meat or blood. (R. 193, 196, Ex. 10). Mr. Dickerson subsequently requested a transfer to the packing department because of the infection. (R. 191–93). The jobs in the packing department, however, require the handling of meat. (R. 2416–20, 2547–50). Mr. Dickerson was not transferred to the meat packing department but rather was assigned to other jobs on the kill floor which required little, if any, contact with meat or blood. (R. 193). These jobs included stunning cows, scalding hogs and pushing the "gut buggy". (R. 193). Mr. Dickerson was provided with a rubber glove to protect his hand while working. (R. 2826). After he was assigned to these new positions, Mr. Dickerson did not further pursue his request for a transfer from the slaughter department, but voluntarily terminated his employment within two weeks. (R. 2826–27).

With regard to the specific assignment of jobs, John Clark and Douglas Boynton, both black employees, testified that the dirtiest and most undesirable jobs were usually performed by black employees. (R. 776–77, 1945–46). David Ramsey, a black employee, confirmed this, stating that the most difficult and dangerous jobs were generally performed by black employees. (R. 873, 876). Harold A. Cole, a white employee, testified that he often performed such jobs as "dipping the hole" together with John Clark. (R. 2733, 2746, 2749). Nathaniel Jackson, a black employee, stated that all employees, both black and white, assisted in cleaning the plant. (R. 2721). Mark Camp testified that he has performed every job that exists at the plant. (R. 2366). Herman Cole, supervisor of the slaughter department, stated that he never assigned jobs based upon race and that employees would often volunteer to "dip the hole" so that they could leave work early. (R. 2852–53).

Most female employees are assigned to the clerical, meat cutting, packing, or sausage departments. (R. 321, Ex. 26). Dr. Gitlow determined that on March 19, 1975, February 1, 1980, and five intermediate randomly-selected dates no women were

employed in the meat processing, smoked meats, delivery, maintenance, custodial, sales, receiving or shipping departments. (R. 321, Ex. 26). Dr. Scheaffer conducted a confidence interval analysis of the departmental assignments of female employees in 1975 and 1980. (R. 2960–69, Exs. XX, YY, ZZ and AAA). Assuming that the percentage of women in the relevant labor pool is 30.6 percent, as estimated by the 1970 census Food and Kindred Products subclassification of the Civilian Labor Force of Marion County, or 39.8 percent, as measured by the 1970 census Civilian Labor Force of Marion County classification, this analysis indicates that H.S. Camp randomly assigned female employees to departments in 1975 and 1980. (R. 2960–69, Exs. YY and AAA).

EEOC introduced a list prepared by Dennis Camp of jobs requiring heavy lifting which he believed could not be performed by women. (Ex. 23). These jobs include work in the meat processing, shipping, receiving and delivery departments as well as the operation of the grinder, mixer and chopper machines in the sausage department. (Ex. 23). These were not jobs that women were automatically excluded from, but rather jobs that women had tried but generally were unable to perform due to the physical limitations. (R. 1604, 1620). No evidence was introduced of any woman who actually applied for or requested a transfer to one of these positions and who was physically qualified to perform the job.

*Promotions*

Most department supervisors at H.S. Camp are employees who were promoted to the position of supervisor after working several years at various jobs within the department, although occasionally a person is hired as a supervisor. (R. 1652–54). There are no formal written requirements for a supervisory position. (R. 1529–50, 2628–30). Promotions are generally based upon the subjective evaluation of the department supervisors and executive managers. (R. 1529–50, 1652–53). Dennis Camp, the personnel director, testified that in determining whether to promote someone to a supervisory position, qualities such as leadership, resourcefulness, punctuality, workmanship, efficiency and motivation are considered. (R. 1652–53, 3068). H.S. Camp does not post notices announcing job vacancies.

Patricia Dawson, a black female employee, was promoted to supervisor of·the packing department on April 18, 1977. (R. 1368). This promotion was granted after Patty Coffie filed her initial charge of discrimination with EEOC but before ·EEOC instituted this action against H.S. Camp. (R. 2628). No other black or female employee has been promoted to a supervisory position. (R. 1368).

David Ramsey, a black employee, worked in the slaughter department for 17 years. (R. 821–24). Rudolph Carpenter, Mr. Ramsey's superior, was scheduled to be transferred and asked Mr. Ramsey if he was interested in being promoted to supervisor of the slaughter department. (R. 832, 2294a). Mr. Ramsey told Mr. Carpenter that he needed time to think about it. (R. 832). After two or three weeks Mr. Ramsey informed Mr. Carpenter that he was interested in the position provided the other supervisors would not be permitted to reassign or demand assistance from his subordinates. (R. 832–33, 837–38). Mark Camp testified that he did not promote Mr. Ramsey because he was told that Mr. Ramsey was concerned that the other black employees would be "jealous of him and would call him an Uncle Tom" and, therefore, did not want the position. (R. 2294a). The Court finds that H.S. Camp produced no evidence of a legitimate nondiscriminatory reason for refusing to promote Mr. Ramsey.

H.S. Camp hired Herbert Miller, a white male, for the position of slaughter department supervisor. (R. 841, 2295a–96a). Mr. Miller held the position of slaughter department supervisor for three to four years and the position became available again in 1977. (R. 2295a–96a). Mr. Ramsey did not apply for the position at that time because of his failure to be promoted earlier. (R. 942).

Monroe Leahmon, a black employee who worked in the slaughter department, com-

plained of not being promoted to department supervisor. However, Mr. Leahmon never applied for the job. (R. 2632). Mr. Leahmon suffered from a speech impediment and a drinking problem. (R. 744–46, 2576, 2228, 2235). H.S. Camp hired Rudolph Rayburg, a white male, to replace Mr. Miller as supervisor of the slaughter department. (R. 2296a).

The position of slaughter department supervisor became vacant once again when Mr. Rayburn left H.S. Camp in 1973. Herman Cole, a white male, who had worked on the kill floor for several years and had a considerable amount of experience in the meat packing business, was promoted to the position at that time. (R. 2289a–90a).

Robert Manns, a black employee, was hired in April 1979 and assigned to the job of cutting hogs with an air-powered saw in the meat processing department. (R. 1813–17). This is one of the most difficult jobs in the meat processing department and requires considerable skill which is obtained through on-the-job training. (R. 1824, 1884–85). After three or four months at this position, Mr. Manns asked his supervisor, Mr. Cole, if he could be promoted or transferred to another position within the meat processing department. (R. 1827). Mr. Cole stated that Mr. Manns had made very good progress but that he had not completely learned how to operate the saw. (R. 2760–61). Mr. Cole further stated that Mr. Manns was not transferred or promoted to another position at that time because most of the other employees in the meat processing department were also trainees. (R. 2760–61). Mr. Cole explained that the saw operator is the key position in the department because it is the beginning of the assembly line and, therefore, regulates the production of the department. (R. 2760–61).

Although Mr. Cole denied Mr. Manns' request for a transfer or promotion, he indicated that a transfer might be possible after Mr. Manns had completely learned how to operate the saw. (R. 2760). Mr. Manns was late for work several times because of personal problems and trouble with his car.

(R. 2758). Mr. Cole did not discipline Mr. Manns for his tardiness and allowed him time off to work out his personal problems. (R. 2758). Mr. Manns voluntarily quit his job three weeks after requesting a transfer or promotion. (R. 2759). The Court finds that the denial of Mr. Manns request for a transfer or promotion was based upon legitimate nondiscriminatory reasons and that race was not a factor in the decision.

Patty J. Coffie, a black employee, worked in the sausage department. (R. 1157). Mark Camp, who was Ms. Coffie's supervisor, considered Ms. Coffie to be one of the most experienced employees in the sausage department. (R. 2409). Ezra Lee Ferrell, a white male, worked in the sausage department for many years and was promoted to the position of department supervisor when Mark Camp vacated the position. (R. 1357–58). Ms. Coffie was able to perform most of the jobs in the sausage department except operating the chopping machine and the smoke house. (R. 1352–53). Mr. Ferrell testified that Ms. Coffie was able to learn and perform these various jobs effectively. (R. 1352–53). Mr. Ferrell eventually was transferred to another department when he became ill as a result of frequent exposure to the cold temperatures in the refrigerated rooms in the sausage department. (R. 1173). Mr. Ferrell indirectly learned that Ms. Coffie was interested in the position of supervisor of the sausage department. (R. 1172). However, there is no evidence establishing that Ms. Coffie directly applied for or requested a supervisory position. H.S. Camp hired Robert Horn, a white male, to fill the position of supervisor of the sausage department. (R. 1173–74).

*Wages*

The earnings of employees at H.S. Camp vary primarily according to seniority and the type of job being performed. (R. 3111, Ex. 14). Obviously, certain positions such as department supervisor are more valuable to the company than others and, therefore, the employees who perform those jobs receive a greater amount of compensation.

(R. 3111). H.S. Camp has a specific written policy with respect to wages and salaries. (Ex. 14). Employees are generally hired at the minimum wage and are periodically evaluated for pay raises. (Ex. 14).

Dr. Howard S. Gitlow, EEOC's expert statistician, examined the payroll records of H.S. Camp from May 31, 1975 through November 1, 1978 and determined that the average gross weekly pay was $234.16 for white employees and $132.96 for black employees. (R. 317, Ex. 26). For male employees the average gross weekly pay during this period was $233.66, while the average gross weekly pay for female employees was $134.56. (R. 317). Dr. Gitlow also determined that the average gross weekly pay for newly-hired white employees from 1976 through 1978 was $157.79 compared to $128.51 for newly-hired black employees. (R. 319, Ex. 26). Newly-hired male employees from 1976 through 1978 received an average gross weekly pay of $155.94, while newly-hired female employees received an average gross weekly pay during that period of $110.04. (R. 319, Ex. 26). In conducting his analysis, Dr. Gitlow did not consider seniority or the type of job being performed.

Dr. Richard L. Scheaffer, H.S. Camp's expert statistician, analyzed the earnings of black and white employees on five randomly-selected dates from October 3, 1975 to September 6, 1978. (R. 2981–82, Exs. LL, MM, NN, OO and PP). Dr. Scheaffer excluded the earnings of supervisors and the earnings of employees with significantly greater seniority than most employees. (R. 2987–89). He determined that in the general worker category during the week of October 3, 1975, the average hourly wage for white employees was $3.10 while the average hourly wage for black employees was $3.25. (R. 2987–88). During that week, the average hourly wage for male employees in the general worker category was $3.12 compared to an average hourly wage of $3.19 for female employees. (R. 2987). Dr. Scheaffer concluded that these disparities were not statistically significant. (R. 2987–88). In the slaughter department during the week of September 6, 1978, the average hourly wage for black employees was $3.06 while the average hourly wage for white employees was $3.48. Dr. Scheaffer concluded that this disparity equaled 1.12 standard deviations and was not statistically significant. (R. 2990–91). Dr. Scheaffer conducted similar analyses of other departments during the five weeks selected and concluded that there were no statistically significant disparities between the wages of black and white employees and male and female employees on those dates. (R. 2991).

Monroe Leahmon, a black employee, testified that he only received four or five raises of 10 to 15 cents each while employed at H. S. Camp. (R. 739). However, he also stated that he started working at H. S. Camp in 1964 earning 85 or 90 cents per hour and was earning $4.15 per hour when he left the company in 1976. (R. 740). Consequently, it is clear that Mr. Leahmon received substantially more or larger raises than he originally stated.

David Ramsey, a black employee, testified that the management of H. S. Camp refused for four years to give him a raise of 25 cents per hour. (R. 829–30). However, payroll records reveal that Mr. Ramsey received 11 pay raises from October 1968 through May 1974 and that when he left the company in May 1974 he was earning $3.50 per hour. (R. 3077–78).

Israel Dempsey, a black employee, testified that he never earned more than $1.40 per hour while working at H. S. Camp. (R. 3415). However, the payroll records show that he actually earned $2.10 per hour in 1971. (R. 3632).

The testimony of other witnesses indicates that both black and female employees received pay raises. Cedrick Brigham, a black employee, received three raises and was earning $3.65 per hour when he was discharged. (R. 1126). Patty Coffie started working at H. S. Camp in 1970 earning $2.50 per hour. (R. 1158). She received pay raises each time she learned a new job skill and was earning $3.25 per hour when she was discharged, making her the third highest paid employee in the sausage department. (R. 1294, 2409).

*Terms and Conditions of Employment*

EEOC alleges that H. S. Camp discriminated against black employees in the terms and conditions of employment by calling black employees by their nicknames, using racial epithets, requiring black employees to work more hours than white employees, threatening and mistreating black employees, and failing to give telephone messages to black employees. EEOC further alleges that an H. S. Camp supervisor harassed a white female employee in retaliation for contacting EEOC. This latter allegation, however, is not a separate cause of action, although evidence of the alleged retaliation was admitted in support of EEOC's claims under Section 703(a) of Title VII.

David Ramsey, a black employee, had the nickname "Dagwood" before he started working at H.S. Camp. (R. 931–32). Mr. Ramsey stated that he would rather be called David, although he did not mind being called by his nickname. (R. 1014–17). At work he was called both David and Dagwood. (R. 1014). Both black and white employees referred to Mr. Ramsey as Dagwood, and Mr. Ramsey never objected to being called by his nickname. (R. 2587). Nathaniel Jackson, a black employee was given the nickname "Boobie" by his mother. (R. 2713). Mr. Jackson stated that he would rather be called by his nickname than his real name. (R. 2713).

The management of H.S. Camp has never assigned a nickname to an employee but calls an employee by his or her nickname if he or she happens to have a nickname. (R. 2295). There is no evidence that any employee, black or white, felt demeaned or insulted when they were called by their nickname.

Douglas Boynton testified that Mark Camp once referred to David Ramsey, a black employee, as a "nigger". (R. 1946–48). Mark Camp testified that he never called a black employee a "nigger" but that he had heard the term "nigger" used by both black and white employees. (R. 2587–88). He further stated that black employees commonly used the term "nigger" referring to another black employee during an

argument. (R. 2588–89). The Court finds that the evidence does not establish that racial epithets such as "nigger" were used by the management of H.S. Camp.

David Ramsey testified that in the receiving and shipping departments black employees generally work early in the morning until 7:00 A.M. and that white employees generally work after 7:00 A.M. (R. 870, 1032). He further stated that black employees sometimes were not given telephone messages at work until two or three weeks after the call, while white employees received telephone messages promptly and were even called from their work to accept telephone calls. (R. 845).

Israel Dempsey, a black employee who worked in the slaughter department, had finished working one day and started to leave when his supervisor, Herbert Miller, told him that he would have to stay and help clean the kill floor. (R. 1958–62, 3385). Mr. Dempsey told Mr. Miller that his knees hurt due to arthritis and that he had to go home because he was having difficulty walking. (R. 1958–62, 3385). When he attempted to leave, Mr. Miller stopped him, held a knife to his neck and forced him to stay to clean the kill floor. (R. 1958–62, 3385).

Ulysses Grant, a black employee, testified that he never saw black employees being treated unfairly because of their race. (R. 2861). Mr. Grant further stated that he thought that H.S. Camp had treated him well. (R. 2861).

The facts surrounding the alleged retaliatory conduct are as follows. On September 26, 1979, Eileen Barber, a white female employee at H.S. Camp, contacted EEOC by telephone, in response to a legal notice which appeared in the local newspaper, and stated that H.S. Camp discriminated in paying wages. (R. 1920–31). On October 1, 1979, counsel for EEOC mailed a letter to counsel for defendant listing Ms. Barber as one of the persons who contacted EEOC in response to the legal notice. (Exs. 30, GG). Ms. Barber was subsequently interviewed in Donald Camp's office by two attorneys representing H.S. Camp. (R. 1920–31). Also

present were Donald Camp, Dennis Camp, and Samuel Camp. (R. 1920–31). Willard Ayres introduced himself as being an attorney for H.S. Camp and explained to Ms. Barber that she was not obligated to answer any questions. (R. 1920–31). Ms. Barber testified that she was frightened but did not inform anyone at the interview that she did not want to answer any questions. (R. 1920–31). She further stated that during the interview one of the attorneys for H.S. Camp asked: "Eileen Barber, why have you decided to become a witness against the Camps?" and that Dennis Camp then stated: "If you had any problem with the company, why didn't you come to us first?" (R. 2109–10).

Ms. Barber stated that following the interview she was "harassed" by Samuel Camp, her supervisor. (R. 1927). However, she later indicated that this harassment began when Samuel Camp became supervisor of the sausage department in August of 1979. (R. 1927). Ms. Barber testified that the harassment by Samuel Camp consisted of strict enforcement of company rules and policies. She further stated that Samuel Camp enforced the rules and policies equally with regard to all employees in the department and that all of the employees in the department thought that Samuel Camp was generally unfair. (R. 2139–42). Samuel Camp refused to let employees take breaks during working hours, assigned employees who had finished a particular job to other work, and required employees to bring a note from their doctor when they were absent due to illness. (R. 2139–42).

Samuel Camp testified that the department was inefficient under the previous supervisor and that he had decided to improve the performance of the department by enforcing all company rules and policies. (R. 2777). He further stated that he treated all employees equally and that his treatment of Ms. Barber did not change after she had contacted EEOC. (R. 2779, 2788). The Court finds that there is no evidence that Samuel Camp harassed Ms. Barber in retaliation for complaining to EEOC of alleged discriminatory employment practices.

### Segregated Restroom Facilities

Prior to the passage of the Civil Rights Act of 1964, H.S. Camp posted written notices at the entrance to the men's restroom which stated "Colored" and "White". (R. 1428–29). These signs were removed during the mid-60's. (R. 1429). In 1969, a new restroom was constructed with a partition approximately five feet high and 11 feet long which divided the restroom in half with an equal number of sinks, toilets and lockers on each side. (R. 1431, 2570, Ex. 49). There is one door to the new restroom which provides equal access to both sides. (R. 1431, 2570). Lockers were installed in the restroom in a row extending almost the length of the room. (R. 1431, 2570). The partition runs perpendicular to and bisects the row of lockers. (Ex. 49). The lockers are bolted together and to the floor. (R. 2053).

In the old restroom, the lockers were unsupported and were often overturned by vandals. (R. 2568). An engineer hired by H.S. Camp to design the new restroom suggested the placement of the partition to provide a brace for the lockers. (R. 2569). No signs were posted in the new restroom directing black or white employees to either side of the restroom.

Ernest Dickerson, a black employee, testified that although no one told him, he felt that he was expected to use only one side of the restroom. (R. 190, 204). Mr. Dickerson stated that he generally used the shower and toilets on only one side of the restroom but often would go to either side to use a mirror to comb his hair. (R. 204).

Monroe Leahmon, a black employee, testified that all the black employees went to the right side of the new restroom while all the white employees went to the left side. (R. 732–36). Mr. Leahmon stated that it was understood that the black employees were to use the right side of the restroom and that he always used the right side of the restroom. (R. 768–69).

John Clark, a black employee, testified that while he was employed at H.S. Camp from 1960 to 1974, the black employees

were expected to and did use only the right side of the restroom while the white employees used only the left side. (R. 782). However, he stated that he never saw a sign indicating that black employees could only use the right side and was never told that he had to use the right side. (R. 807).

David Ramsey, a black employee, testified that no one told him to use only one side of the restroom but that black employees were expected to use the right side and white employees were expected to use the left side. (R. 942). He further stated that generally the black employees used the right side and the white employees used the left side but that black and white employees often would go to either side just to talk. (R. 856).

Nordice Reed, a black employee, testified that when he first used the new restroom, he attempted to use the left side. (R. 3597). He stated that Herman Cole, a white male supervisor, told him that black employees were supposed to use the right side of the restroom and that he should not use the left side. (R. 3597). Thereafter, Mr. Reed used only the right side of the restroom. (R. 3597–3600).

Mark Camp testified that black and white employees have lockers on either side of the restroom and that he has consistently observed both races using both sides of the new restroom. (R. 2572).

Harold Cole, a white employee, testified that he has observed employees of both races using both sides of the restroom. (R. 2741–42). Mr. Cole further stated that he has used both sides of the restroom and that his locker is on the right side next to the locker of John Clark, a black employee. (R. 2741–42). He further stated that he was never told that black and white employees were to use different sides of the restroom. (R. 2741).

Herman Cole testified that when he started working at H.S. Camp in 1969, employees of both races were using both sides of the old restroom. (R. 2818). Similarly, he stated that employees of both races were using both sides of the new restroom. (R. 2818). Mr. Cole further stated that he has had a locker on both sides of the new restroom and once had a locker between Monroe Leahmon and Nordice Reed who are both black employees. (R. 2819). Mr. Cole stated that at one time he shared a locker with Ursell Taylor, a black employee. (R. 2820).

Ulysses S. Grant, a black employee, testified that before the new restroom was built, employees of both races were using both sides of the old restroom. (R. 2859). When the new restroom was constructed, Mr. Grant asked Ezra Ferrell, his supervisor, if he could use either side of the restroom. (R. 2857). Mr. Ferrell explained to Mr. Grant that he was free to use either or both sides. (R. 2857). Mr. Grant stated that he used both sides of the new restroom and has observed employees of both races using both sides of the restroom. (R. 2858).

Nathaniel Jackson, a black employee, testified that no one ever told him that he could not use both sides of the restroom. (R. 2719). He further stated that he personally used the facilities on both sides of the restroom and saw both black and white employees doing likewise. (R. 2719).

### EEOC Posters

The general practice at H.S. Camp has been to display all required EEOC posters and bulletins on the employee bulletin board. (R. 783, 1384, 1388, 1391, 1638). However, EEOC posters were not posted from October 1979 through April 1980. (R. 1541, 3079). Dennis Camp stated that the posters were not displayed during that period because the employee bulletin board had been destroyed or lost while the plant was undergoing extensive renovations and construction. (R. 3081). Mr. Camp further testified that he did not have another EEOC poster and called the EEOC main office for a replacement but was told that the posters were not available. (R. 3081–82). He later was able to obtain a copy of an EEOC poster from a manager of a local business which he then posted. (R. 3081). The delay in obtaining and posting new EEOC posters, therefore, was not intended

to deny any employee of his or her rights and there is no evidence that any employee was adversely affected by the failure to display the posters during this period of time.

*Discharges*

Termination of employment is divided into four categories under the personnel policy of H.S. Camp: resignation (employees who quit voluntarily), layoff (non-disciplinary dismissal with an offer of reemployment when conditions permit), released (termination due to mental or physical inability to perform the assigned job), and fired (termination due to violation of a rule or policy, dishonesty, insubordination, or lack of concern for quality workmanship). (R. 1655, Ex. 14). Generally, when an employee has violated a company rule or policy, the employee is issued a warning and is subject to dismissal only if he or she has previously committed other violations. (R. 1655–56, Ex. 14). However, an employee may be fired after only one violation if the offense is flagrant and severe. (R. 1655–56).

Dr. Howard S. Gitlow, EEOC's expert statistician, determined that 29 black employees, 187 white employees, and 15 employees whose race could not be determined were discharged from employment between March 19, 1975 and February 1, 1980. (R. 326, 328, Ex. 41). Excluding the employees whose race was not available, Dr. Gitlow determined that 18 black employees voluntarily resigned and 11 were either fired or laid off during this period, while 148 white employees voluntarily resigned and 39 were fired or laid off. (R. 328). Thus, 37.9 percent of the black employee terminations were involuntary during this period while 20.8 percent of the white employee terminations were involuntary. (R. 328–30). Dr. Gitlow concluded that there was a six percent chance of obtaining these results and that these figures showed a moderate statistical disparity. (R. 328).

Dr. Gitlow further testified that his examination of the termination files was cursory and that he did not have an opportunity to check his figures. (R. 332–33, 643–44). He stated that he would have preferred to have had more time to conduct his analysis and indicated that he was forced to make a "series of assumptions". (R. 644). In particular, Dr. Gitlow noted that he would not be surprised if there were some errors in his calculations and specifically indicated that his analysis was based upon the assumption that the underlying figures were correct. (R. 332–33).

Douglas Boynton, a black employee, was fired by H.S. Camp in 1970. (R. 3083–84). Both Mark and Dennis Camp testified that Mr. Boynton was discharged because he was accident prone. (R. 3083–84). Mr. Boynton lost part of a finger while operating the meat grinder. (R. 1952). He testified that this occurred at 9:30 P.M. after he had worked 17 hours and had attempted to leave the plant but was told to stay and grind some lard. (R. 1953). Mark Camp testified that on the day of the accident Mr. Boynton started work at 6:00 A.M. and that the accident occurred about 1:00 P.M. (R. 2618).

Mr. Boynton was also injured in 1977 when he was skinning a cow with William Michaels. (R. 3576). Mr. Michaels, who was blind in one eye and losing vision in the other eye, accidently cut Mr. Boynton's hand. (R. 3459, 3576, 3579). Carey Wallace, a white employee, was also discharged because he was accident prone. (R. 3084). Dennis Camp stated that because much of the work in the plant is very dangerous, it is necessary to discharge employees who have a propensity to cause accidents. (R. 3083–84). The Court finds that Mr. Boynton was discharged because of legitimate nondiscriminatory reasons and that race was not a factor in the decision to discharge him.

Cedrick Brigham, a black employee, was fired after being accused of stealing stew meat from a freezer. (R. 1737). Many of the products of H.S. Camp are very expensive and because it is fairly easy to steal items, the company maintains a strict policy concerning employees who are caught stealing meat. (R. 3099–3100). Both white and

black employees have been discharged for theft. (R. 2614–15). Richard Hooey, a white employee, was also fired for attempting to steal meat. (R. 3193). The Court finds that Mr. Brigham was discharged based upon the good faith belief and determination of the management of H.S. Camp that he was involved in stealing meat and not because of his race.

Henry Mobley, a black employee, was discharged by H.S. Camp in 1971. (R. 1089–90). Mr. Mobley asked his supervisor, Rudolph Carpenter, for a day off in two weeks so he could get married. (R. 1087). Mr. Carpenter did not give a definite answer but asked Mr. Mobley why he could not have his wedding on a weekend. (R. 1089). Mr. Mobley replied that he had already made plans to have the wedding on a weekday. (R. 1089). Believing that Mr. Carpenter had acquiesced and granted his request, Mr. Mobley took the day off that he had requested. (R. 1089). Shortly thereafter, Mr. Mobley was informed that he had been fired, although no reasons for the decision were given. (R. 1091). Although failure to grant such a request may appear to be unreasonable, an unexcused absence from work is grounds for dismissal.

Patty Coffie, a black female employee, who filed the initial charge of discrimination against H.S. Camp with EEOC, was fired on August 15, 1974. Ms. Coffie often experienced severe pain due to menstrual cramps which sometimes required her to be absent from work. The day before Ms. Coffie was discharged, she informed Ezra Ferrell, her assistant supervisor, that she probably would not be able to work the next day because of menstrual cramps. (R. 1187). When she arrived at work on August 15, 1974, at approximately 6:30 A.M., she felt ill and decided that she could not work. (R. 1182). She could not find Ezra Ferrell or her supervisor, Robert Horn, in the building at that time. (R. 1182). Earlier that morning Mr. Ferrell, after lighting the smokehouse, left a note for Mr. Horn on a clip board indicating that he was ill and had to go home. (R. 1360–61). Mr. Ferrell's wife later called H.S. Camp and left a message that Mr. Ferrell was sick and had

gone home. (R. 1360). Mr. Ferrell was not fired for leaving work on that day. (R. 1360–61).

Mr. Ferrell and Ms. Coffie were the only employees in the sausage department who could operate most of the machines. (R. 1287–88, 1299–1300). Because of Mr. Ferrell's absence, Ms. Coffie would be required to run most of the machines in the department on that day. (R. 1299–1300). Before leaving, Ms. Coffie went to the slaughter department and told Monroe Leahmon to inform Mr. Horn that she was sick and had to go home. (R. 737, 1182). Monroe Leahmon testified that at approximately 7:30 A.M. he told Mr. Horn that Ms. Coffie was sick and had gone home. (R. 737–38). No evidence was produced to rebut this testimony. While she was walking through the plant Ms. Coffie was upset and announced that she "wasn't going to do all the damn work by herself because she was sick." (R. 2726–27, 2848–49, 2885–86). She then drove home and went to sleep. (R. 1183).

H.S. Camp's personnel rule with regard to absence from work due to illness provides as follows:

Any employee who will be away from work for any reason *must* telephone the plant right away and personally inform his supervisor. If his supervisor is not available at the time he must leave a message to be given to his supervisor.

Failure to notify the supervisor of expected absence will not be tolerated. It can result in immediate dismissal.

(Ex. 14). The parties have stipulated that if Ms. Coffie did leave a message for her supervisor on August 15, 1974 indicating that she was absent from work that day due to menstrual cramps, such a message would be in compliance with the rule stated above.

Later that morning, Monroe Leahmon telephoned Ms. Coffie and told her that Mr. Horn had fired her. (R. 1183). Ms. Coffie then called Mark Camp to see if she had been fired. (R. 1183). Mark Camp testified that he told Ms. Coffie that he was aware that she had left the plant proclaiming that

she was not going to work and asked her if she thought she ought to be fired. (R. 2409). He stated that at that time Ms. Coffie did not indicate that she was sick and did not deny making the statement. (R. 2409–11). Ms. Coffie testified that she also called Dennis Camp and informed him that she had gone home because she was sick. (R. 2683–84).

Mark Camp testified that on the day Ms. Coffie was fired he arrived at work around 7:00 A.M. and noticed that work was not being performed in the sausage department. (R. 2407–08). He learned from Mr. Horn that Ms. Coffie had left the plant stating loudly that she was not going to do all the work that day. (R. 2407–08). Mr. Horn suggested that Ms. Coffie should be fired and Mark Camp agreed. (R. 2408). On August 27, 1974, shortly after Ms. Coffie was discharged, H.S. Camp hired Bruce La-Pointe, a white male. (R. 1679–81).

Ms. Coffie applied for unemployment compensation. (Ex. B). Following a hearing, the Bureau of Unemployment Compensation held that benefits were not owed because of the following reason:

> You were discharged when you reported for work and left work almost at once without notifying your supervisor of the reason. You state that you were ill but you have presented no evidence to show that you had to leave due to illness. Your actions caused your discharge and were in disregard of your employer's best interests.

(Ex. B).

Shortly after arriving at work one day, Owen Damron, a white male supervisor, went home because he was ill and upset upon finding that only one or two of his subordinates had come to work that day. (R. 2405–06). This incident was very similar to the circumstances surrounding Patty Coffie's discharge. However, Mr. Damron was given a two week vacation to recover from his illness and only received a demotion. (R. 2405–06). Mark Camp explained this incident as follows:

> Mr. Damron was in what you would say poor health. He had—because of the

work and not really being suited to be a foreman, his nerves had got in a bad condition. And he was under the doctor's treatment at that particular time.

And so, he came to work at 5:00 o'clock one morning and got his inventory and got everything set up and ready to go, and only about two of his crew had shown up at that time. And so he became discouraged and despondent and very upset and went home. And he left word with the young lady, Helen Hobson, I think her name was, who was pumping the hams, that he was too upset, he couldn't stay, he had to go home and get some rest. And meantime we had called the other members of his crew and located them, and for one reason or another, their cars being broken down or mama being sick or something of this nature, they were late coming in. And this was what upset him.

And after Helen Hobson told us, my son and I, that Owen Damron had gone home, us—we knew his mental condition and we knew his physical condition and so we called him and asked him what the trouble was. And he told us that he had just reached a mental condition that he was afraid he would have a nervous breakdown or just blow his top. And that he had told Mrs. Hobson that he was going to go home, and for her to relate to us. And he said, let me rest the rest of the day, and I'll come in this afternoon and talk with you.

He did come in that afternoon, and my son and I talked with him. And we agreed to give him two weeks' vacation at this particular time to get settled back and get his nerves back into shape and get his physical condition straightened back out, and that my son would take over as the supervisor of the kitchen, as far as handling the administrative part of it, the people and the things that were bothering him, in other words. And Mr. Damron agreed to stay on and to help my son who is not as experienced as I would like for him to have been to take over this department.

The Court finds that Ms. Coffie suffered from menstrual cramps on August 15, 1974 and complied with the company rules and procedures by leaving a message with Monroe Leahmon to be given to her supervisor indicating that she was sick and had gone home. The Court further finds that the machines were not being operated in the sausage department on August 15, 1974 because both Ezra Ferrell and Patty Coffie were absent due to illness. There is no evidence that Patty Coffie disrupted the operation of the plant by announcing to other employees that she was not going to do all the work because she was sick.

## CONCLUSIONS OF LAW

### Jurisdiction

This Court possesses jurisdiction over the parties and the subject matter of this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* All conditions precedent to this action have been met.

### Burden of Proof

■■■ EEOC has alleged that H.S. Camp has intentionally engaged in unlawful employment practices. Consequently, since this is a disparate treatment case rather than a disparate impact case, proof of discriminatory intent is required. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). However, direct evidence of discriminatory intent is not necessary, it may be inferred from circumstantial evidence. *Id.*

The parties disagree as to the applicability of *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and the proper allocation of the burden of proof. H.S. Camp contends that under *Burdine,* only the burden of production shifts to the defendant once a prima facie case has been established and that the ultimate burden of persuasion by a preponderance of the evidence remains with the plaintiff at all times. EEOC, however, asserts that *Burdine,* an individual employment discrimination action, is inapplicable where classwide discriminatory treatment is alleged. EEOC further argues that under *International Brotherhood of Teamsters v. United States, supra,* more proof is required to rebut a prima facie case in a Title VII class action than in an individual employment discrimination action. EEOC appears to suggest that the burden of persuasion rather than the burden of production shifts to the employer.

In resolving this issue, it is necessary to review the standard of proof under Title VII as developed by the Supreme Court in both individual and classwide employment discrimination actions. In *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a three-step procedure for allocating the burden of proof in an individual employment discrimination case. *Id.* at 802–04, 93 S.Ct. at 1824–1825. The plaintiff has the initial burden of establishing a prima facie case which may be done by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. The Court, however, did not intend this formula to be the sole method of proving a prima facie case, noting that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to the differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. Once a prima facie case has been established, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason ior the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Finally, if the employer's reason for rejection rebuts the prima facie case, the employee "must be afforded a fair opportunity to show that [the employer's]

stated reason for ... rejection was in fact pretext." *Id.* at 804, 93 S.Ct. at 1825.

Following the decision in *McDonnell Douglas*, there remained some uncertainty as to whether the burden of production or persuasion shifted to the employer after a prima facie had been established. *See James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977); *Wells v. Sherwood Medical Indus.*, 549 F.2d 1170 (8th Cir. 1977); *Robinson v. Union Carbide Corp.*, 538 F.2d 652 (5th Cir. 1976). Although the Supreme Court was confronted with this particular question on two subsequent occasions,[11] the issue was not completely resolved until the Court's decision in *Burdine*. *Burdine* was an individual Title VII action brought by a female employee who alleged that her employer failed to promote her and subsequently discharged her because of her sex. In reviewing the allocation of proof set forth in *McDonnell Douglas*, the Court in *Burdine* stated that:

> The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff. (citations omitted). The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question.
>
> The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case serves an important function in the litigation. It eliminates the most common nondiscriminatory reasons for plaintiff's rejection. (citations omitted). . . . Establishment of the prima fa-

cie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

450 U.S. at 253–54, 101 S.Ct. at 1093–1094. The Court then clarified the employer's intermediate evidentiary burden as follows:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. (citations omitted). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Id.* at 254–56, 101 S.Ct. at 1094–1095. Finally, the Court described the third step in the allocation of proof:

> The plaintiff retains the burden of persuasion. She now must have the oppor-

---

**11.** *See Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco*

*Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

tunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Id. at 256, 101 S.Ct. at 1095. *Burdine*, therefore, clearly establishes that the burden which shifts to the employer in an individual discrimination action is merely the burden of producing sufficient evidence to rebut the presumption of discrimination created by plaintiff's prima facie case and that the plaintiff retains the ultimate burden of persuasion by a preponderance of the evidence.

The Supreme Court considered the allocation of proof in a class action under Title VII in *International Brotherhood of Teamsters v. United States, supra.* The plaintiffs in *Teamsters* alleged a pattern or practice of employment discrimination and presented statistical evidence together with the testimony of individuals who cited over 40 specific instances of discrimination. *Id.* 431 U.S. at 338, 97 S.Ct. at 1855. Contending that the method of proof in a pattern-or-practice employment discrimination case was equivalent to that outlined in *McDonnell Douglas*, the employer argued that the plaintiffs were required to establish the *McDonnell Douglas* prima facie elements with respect to each class member to satisfy their initial burden. *Id.* at 357, 97 S.Ct. at 1865. The Court rejected this contention, noting that *McDonnell Douglas* did not create an inflexible standard for establishing a prima facie case. *Id.* at 358, 97 S.Ct. at 1866. Placing *McDonnell Douglas* in the proper perspective, the Court stated that:

The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

*Id.*

The *Teamsters* Court referred to *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), as illustrative of the application of this principle in the context of a class action. 431 U.S. at 358, 97 S.Ct. at 1866. In *Franks*, the Court held that the trial court erred in requiring the individual class members to show that they were qualified for the job and that a vacancy had existed. 424 U.S. at 771–72, 96 S.Ct. at 1267–1268. The Court in *Franks* announced that by demonstrating a pattern or practice of discrimination, the class action plaintiffs had established a prima facie case which created a rebutable presumption in favor of individual relief. *Id.* at 772, 96 S.Ct. at 1267. The *Teamsters* Court acknowledged that *Franks* represented another means of establishing a prima facie case under Title VII. 431 U.S. at 360, 97 S.Ct. at 1867.

After reviewing the *Franks* decision, the Court in *Teamsters* delineated the allocation of proof in a pattern-or-practice Title VII class action as follows:

Although not all class actions will necessarily follow the *Franks* model, the nature of a pattern-or-practice suit brings it squarely within our holding in *Franks.* The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. (citations omitted). At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by dem-

onstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief.

*Id.* at 360–61, 97 S.Ct. at 1867–1868. By footnote, the Court further clarified the type of rebuttal evidence that an employer must produce in a Title VII class action:

The employer's defense must, of course, be designed to meet the prima facie case of the Government. We do not mean to suggest that there are any particular limits on the type of evidence an employer may use. The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decision making. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy. In such cases, the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result.

*Id.* at 361 n. 46, 97 S.Ct. at 1868 n. 46.

■ The Court in *Teamsters*, thus, recognized that the type of evidence and the method of proof utilized in individual and class actions under Title VII are substantially different and, therefore, held that the *McDonnell Douglas* procedure for proving an individual Title VII action is inapplicable in classwide disparate treatment cases. However, the *Teamsters* Court also established that the employer's intermediate evidentiary burden in a classwide employment discrimination case is merely that of producing sufficient evidence to rebut the presumption of discrimination raised by the plaintiff's prima facie case. *See Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798 (5th Cir. 1982); *Rivera v. City of Wichita Falls,* 665 F.2d 531 (5th Cir. 1982). The employer need only "meet the prima facie case of the Government" and the ultimate burden of persuasion remains at all times with the plaintiff. *International Brotherhood of Teamsters v. United States,* 431 U.S. at 361 n. 46, 97 S.Ct. at 1868 n. 46. Consequently, the intermediate evidentiary burden of the employer in a class action is substantially the same as in an individual action under *Burdine,* although obviously the employer's rebuttal evidence will be of a different nature in a class action since a class action prima facie case is usually based upon statistical evidence.

■ The Court, therefore, concludes that the allocation of the burden of proof and the procedure established in *Teamsters* is applicable to the case at bar. The Court further concludes that upon the establishment of a prima facie case by EEOC, the burden which shifts to H.S. Camp is only that of producing sufficient evidence to rebut the presumption of discrimination raised by EEOC's prima facie case and that EEOC retains at all times the ultimate burden of persuasion by a preponderance of the evidence.

*The Role of Statistical Evidence*

■ Proof of classwide discriminatory treatment generally requires the use of statistical evidence. *International Brotherhood of Teamsters v. United States, supra; Falcon v. General Tel. Co. of Southwest,* 626 F.2d 369 (5th Cir. 1980). The Supreme Court in *International Brotherhood of Teamsters v. United States, supra,* acknowledged the importance of statistics in a Title VII class action, noting that:

Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of long lasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population. (citations omitted).

*Id.* at 431 U.S. at 340 n. 20, 97 S.Ct. at 1856 n. 20. However, to carry such weight the statistics must be relevant, material and meaningful. *Falcon v. General Tel. Co. of Southwest, supra*, at 379–81; *Equal Employment Opportunity Commission v. Datapoint Corp.*, 570 F.2d 1264, 1269–70 (5th Cir. 1978); *Capaci v. Katz & Besthoff, Inc.*, 525 F.Supp. 317, 327 (E.D.La.1981). "[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends upon all of the surrounding facts and circumstances." (citations omitted). *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 340, 97 S.Ct. at 1856.

The degree of statistical disparity is of critical importance. *Rivera v. City of Wichita Falls*, 665 F.2d 531, 534 (5th Cir. 1982). A prima facie case of classwide disparate treatment may be established based solely upon statistical evidence where a gross or substantial statistical disparity is shown. *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–2742, 53 L.Ed. 768 (1977); *Rivera v. City of Wichita Falls, supra* at 535 n. 5; *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 328–29 (5th Cir. 1977). A statistical disparity greater than three standard deviations has been held to constitute a gross disparity sufficient to establish a prima facie case without additional evidence. *Hazelwood School Dist. v. United States, supra* 433 U.S. at 309 n. 14, 97 S.Ct. at 2743 n. 14; *Castaneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). Conversely, courts should be extremely cautious in drawing any conclusions where the standard deviation is less than three. *Equal Employment Opportunity Commission v. American Nat'l Bank*, 652 F.2d 1176, 1192 (4th Cir. 1981). Statistical evidence, however, may be buttressed with direct evidence of discriminatory policies and procedures, and individual instances of discrimination. *International Brotherhood of Teamsters v. United States, supra* 431 U.S. at 338, 97 S.Ct. at 1855.

The determination of the most appropriate method of statistical analysis must made on a case-by-case basis. *Falcon v. General Tel. Co. of Southwest, supra* at 382. A statistical analysis of an employer's hiring practices is obtained by comparing the composition of the employer's work force with the composition of the labor pool from which the employer hires his employees. *Castaneda v. Pickard*, 648 F.2d 989, 1002 (5th Cir. 1981). Consequently, the determination of the relevant labor pool is particularly important. *Hazelwood School Dist. v. United States, supra* 433 U.S. at 308 n. 14, 97 S.Ct. at 2742 n. 14; *Equal Employment Opportunity Commission v. American Nat'l Bank, supra* at 1192 n. 11; *Markey v. Tenneco Oil Co.*, 635 F.2d 497, 499 (5th Cir. 1981).

The Fifth Circuit has held that generally "[t]he most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired for the position." *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379 (5th Cir. 1974); *see Hazelwood School Dist. v. United States, supra* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; *Capaci v. Katz & Besthoff, Inc., supra* at 324 n. 9. This method of statistical proof is commonly known as the applicant flow analysis. Because this method utilizes the actual applicants as the rele-

vant labor pool rather than an estimate of those persons in the community who would be expected to apply, the applicant flow analysis is considered the most accurate statistical method of analyzing hiring practices. *Hester v. Southern Railway Co., supra* at 1379.

An alternative method of analyzing hiring practices is the static analysis which employs as the relevant labor pool the group of persons within the general population from which the employer would be expected to draw his employees. *Markey v. Tenneco Oil Co.,* supra at 499; *Fisher v. Proctor & Gamble Mfg. Co.,* 613 F.2d 527, 535 n. 8 (5th Cir. 1980); *Robinson v. Union Carbide Corp.,* 538 F.2d 652, 658 (5th Cir. 1976). Generally, the labor pool used is the Standard Metropolitan Statistical Area (SMSA) in which the employer is located. *Markey v. Tenneco Oil Co., supra* at 497; *Robinson v. Union Carbide* Corp., supra at 658; *Jones v. Tri-county Elec. Cooperative, Inc.,* 512 F.2d 1 (5th Cir. 1975).

Any evidence which would help in narrowing the relevant labor pool should be considered in analyzing the hiring practices of the employer. *Markey v. Tenneco Oil Co., supra* at 501. For example, where the hiring procedure for positions requiring certain qualifications is being challenged, the labor pool selected must consist only of individuals who possess the necessary qualifications. *Hazelwood School Dist. v. United States, supra* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; *Hester v. Southern Railway Co., supra* at 1379 n. 6. The qualifications required must also be reflected in an applicant flow analysis where the labor pool consists of the actual applicants rather than the general population. *Equal Employment Opportunity Commission v. Datapoint Corp., supra* at 1270. Similarly, the appropriate geographical area from which the employer draws his employees must be reflected in the labor pool selected. *Markey v. Tenneco Oil Co., supra* at 497.

Although an appropriate labor pool may be used, other factors may render a statistical analysis inaccurate or unreliable. Obviously, if the underlying data upon which the statistical analysis is based is incomplete or incorrect, the analysis itself will be inaccurate. *Equal Employment Opportunity Commission v. American Nat'l Bank, supra* at 1195. The interest or disinterest of certain members of the relevant labor pool in applying for a job with the employer should be considered in determining the proper evidentiary weight to be accorded to the statistical analysis. *Hazelwood School Dist. v. United States, supra* 433 U.S. at 311–12, 97 S.Ct. at 2743–2744; *Dorthard v. Rawlinson,* 433 U.S. 321, 348, 97 S.Ct. 2720, 2749, 53 L.Ed.2d 786 (1977) (dissenting opinion); *Capaci v. Katz & Besthoff, Inc., supra* at 325; *Equal Employment Opportunity Commission v. Mead Foods,* 466 F.Supp. 1, 3 (W.D.Okla.1977). A prima facie case based upon a statistical disparity between the percentage of female employees in the employer's work force and the percentage of women in the general population has been rebutted by evidence that women found the work unattractive. *Equal Employment Opportunity Commission v. Mead Foods, supra* at 3. Similarly, statistical evidence is unreliable where the company only employs a small number of employees or the sample size selected is small. *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5th Cir. 1979); *Adams v. Reed,* 567 F.2d 1283, 1287 (5th Cir. 1978). The smaller the company or sample size, the greater the likelihood that the under-representation reflects chance rather than discriminatory practices. *Williams v. Tallahassee Motors, Inc., supra* at 693. There is no numerical cutoff point below which the size of the company or sample is considered to be too small to provide a basis for a statistical analysis. *Equal Employment Opportunity Commission v. American Nat'l Bank,* at 1194–95; *Williams v. Tallahassee Motors, Inc., supra* at 693. A statistical analysis of a company employing only 90 employees has been held to be of less probative value than an analysis of a larger company. *Cupples v. Transport Ins. Co.,* 371 F.Supp. 146,

149 n. 1 (N.D.Tex.), *aff'd*, 498 F.2d 1091 (5th Cir. 1974). However, a prima facie case has been established where the statistical evidence was based upon a work force of only 51 employees but was supported by additional non-statistical evidence of discrimination. *Long v. Sapp*, 502 F.2d 34, 40–41 (5th Cir. 1974). Thus, generally where the statistical evidence is based upon a small company or sample size, some proof in addition to the statistical evidence is required. *Williams v. Tallahassee Motors, Inc.*, *supra* at 692; *Keely v. Westinghouse Electric Corp.*, 404 F.Supp. 573 (E.D.Mo.1975).

### Hiring

 EEOC claims that H.S. Camp has intentionally and continuously engaged in discriminatory hiring practices based upon race and sex since July 2, 1965. In support of its allegation of a practice of racial discrimination in hiring, EEOC introduced an applicant flow analysis of the hiring of blacks from 1976 through 1978 which showed a statistical disparity of 5.8 standard deviations. However, although generally such a statistical disparity is considered sufficient to establish a prima facie case of classwide disparite treatment, statistical evidence can only be accorded such evidentiary weight if it is accurate and reliable. *International Brotherhood of Teamsters v. United States*, *supra* 431 U.S. at 340, 97 S.Ct. at 1856.

 EEOC failed to consider the qualifications required for the various positions at H.S. Camp in applying its applicant flow analysis. Although most of the positions at H.S. Camp are unskilled, many of the jobs are very strenuous, requiring the ability to lift heavy objects. Those jobs that do not involve strenuous work, do require some skill or experience, e.g. clerical workers must be able to type, a high school education as well as experience in the meat packing business is required for a sales position, and maintenance employees must be skilled in maintaining electrical, hydraulic and refrigeration equipment and machinery. Although applicant flow data is generally the most relevant labor pool, its relevancy and, consequently, the accuracy of the applicant flow analysis diminish where the applicant flow data does not reflect the qualifications of the applicants and the positions for which they are applying. *Hazelwood School Dist. v. United States*, *supra* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; *Equal Employment Opportunity Commission v. Datapoint Corp.*, *supra* at 1270. EEOC's failure to limit its applicant pool to only those persons who possessed the necessary qualifications for the positions they sought, therefore, lessens the accuracy of its applicant flow analysis.

The accuracy of EEOC's applicant flow analysis of the hiring of blacks is further placed in doubt due to the use of incomplete data. EEOC compared the racial composition of the applicants in 1978 and 1979 to the racial composition of persons hired from 1976 through 1978. Because applicant data was not available for 1976 and 1977, it was necessary for EEOC's expert statistician, Dr. Howard S. Gitlow, to assume that the racial composition of applicants during those years was the same as in 1978 and 1979. Moreover, since the race of 98 of the 360 applicants in 1978 and 1979 was not available, Dr. Gitlow further assumed that the racial unidentified applicants were of the same racial composition as the group whose race was known. Consequently, it is clear that the assumptions made by EEOC as a result of incomplete data detracted from the accuracy of its applicant flow analysis.

 EEOC filed a motion for the imposition of a sanction against H.S. Camp for failure to produce the application forms filed prior to August 1, 1978. Specifically, EEOC contended that the Court should infer that the applications filed prior to August 1, 1978 consisted of evidence which would be unfavorable to H.S. Camp. The Court, however, denied EEOC's motion, noting that the "adverse inference rule" applies only where a party fails to produce relevant evidence that is within its control. The Court further determined that there was considerable doubt whether H.S. Camp was actually aware at the time that the

application forms were destroyed that it was required to preserve all application forms. The Court also found that the evidence established that the applications filed prior to August 1, 1978 were disposed of in accordance with defendant's reasonable business practice. Accordingly, no adverse inference will be drawn from H.S. Camp's failure to preserve applications filed prior to August 1, 1978.

EEOC's expert statistician, Dr. Gitlow, also presented a static analysis of the hiring of blacks from March 19, 1975 through February 1, 1980, utilizing the 1970 census Civilian Labor Force of Marion County classification as the appropriate measurement of the relevant labor pool. However, Dr. Gitlow's calculation of the number of persons employed on the randomly-selected dates was incorrect. Consequently, Dr. Gitlow's static analysis based upon race is clearly inaccurate.

EEOC attempted to bolster its statistical evidence by producing evidence of individual instances of racial discrimination in hiring. However, in each instance the evidence clearly established that H.S. Camp's hiring decision was based upon legitimate nondiscriminatory reasons and that race was not a factor in the decision not to hire the applicant.

■ In summary, the only meaningful evidence of a classwide practice of racial discrimination in hiring that EEOC has introduced is an applicant flow analysis for the period from 1976 through 1978 showing a statistical disparity of 5.8 standard deviations. However, because of the use of incomplete applicant data and the failure to consider the applicant's qualifications, it is questionable whether this statistical evidence alone is sufficient to establish a prima facie case. Nevertheless, even assuming that plaintiff's statistical evidence is sufficient to establish a prima facie case, it appears that H.S. Camp has produced sufficient evidence to rebut a prima facie case. Using the correct number of employees employed on the dates selected by Dr. Gitlow, H.S. Camp presented a static analysis based upon the work force population of Marion County showing an average statistical disparity of 1.39 standard deviations. This disparity is far below the standard deviation level that has been established as constituting a gross statistical disparity. Similarly, a static analysis based upon the 1970 census Food and Kindred Products subclassification reveals an average statistical disparity of only 2.87 standard deviations. Consequently, the Court concludes that even assuming plaintiff's statistical evidence is sufficient to establish a prima facie case, H.S. Camp produced sufficient evidence to rebut a prima facie case and EEOC failed to sustain its ultimate burden of proving a practice of racial discrimination in hiring by a preponderance of the evidence.

In support of its claim of classwide discrimination in hiring based upon sex, EEOC produced Dr. Gitlow's applicant flow and static analyses of the hiring of women from March 19, 1975 through February 1, 1980. Dr. Gitlow concluded that these analyses showed a strong statistical disparity. However, as previously discussed, Dr. Gitlow's calculation of the number of persons employed on the randomly-selected dates used in these analyses was incorrect. Furthermore, Dr. Gitlow failed to limit the labor pool used in his analyses to the persons who possessed the necessary qualifications for a position at H.S. Camp. Moreover, Dr. Gitlow failed to consider the general lack of interest among women in applying for a job in a meat packing plant such as H.S. Camp, as evidenced by the withdrawal of many applications filed by women upon learning of the nature of the work at H.S. Camp.

■ With regard to non-statistical evidence, EEOC presented only one female applicant, Rose P. Powers, whose testimony concerning H.S. Camp's failure to hire her was not rebutted. The Court concludes that EEOC's statistical and non-statistical evidence is insufficient to establish a prima facie case of a practice of discrimination in hiring based upon sex.

### Job Assignments and Transfers

EEOC alleges that H.S. Camp engaged in a practice of discrimination against black

and female employees in assigning jobs and maintaining segregated departments. In support of its claim of classwide racial discrimination in assigning jobs and maintaining segregated departments, EEOC produced Dr. Gitlow's data which established that on March 19, 1975, February 1, 1980 and five intermediate randomly-selected dates, no black employees were employed in the clerical, delivery, maintenance, sales, receiving or shipping departments. The evidence also establishes that most of the black employees at H.S. Camp hold positions in the slaughter, meat processing, meat cutting, sausage, packing and custodial departments, and that black employees have never been assigned to the clerical or sales departments.

With regard to non-statistical evidence, EEOC presented the testimony of three black employees who stated that their transfer requests were denied. All three of the employees worked on the kill floor. Monroe Leahmon and Ernest Dickerson requested transfers because of medical problems. John Clark requested a transfer because of allegedly unfair treatment by his supervisor. H. S. Camp produced no evidence of legitimate non-discriminatory reasons for the denial of these transfer requests.

 EEOC also presented the testimony of two black employees, John Clark and Douglas Boynton, who stated that the most dangerous and undesirable jobs were usually performed by black employees. Although H. S. Camp produced some evidence that white employees also performed some of the undesirable jobs, the evidence establishes that generally black employees were assigned to such jobs. The Court concludes that EEOC's statistical and non-statistical evidence is sufficient to establish a prima facie case of classwide discrimination against black employees in assigning jobs and maintaining segregated department based upon race since July 2, 1965.

 H.S. Camp's expert statistician, Dr. Richard Scheaffer, analyzed H. S. Camp's departmental assignments of black employees in 1975 and 1980. Based upon the 1970 census estimate of the racial composition of the relevant labor pool, Dr. Scheaffer concluded that the employees in 1975 and 1980 had been randomly assigned to departments. However, using the racial composition of the relevant labor pool based upon the applicant data for 1978 and 1979, Dr. Scheaffer determined that randomness in departmental assignments was highly unlikely. The Court concludes that this statistical evidence is insufficient to rebut EEOC's prima facie case of classwide discrimination against black employees in assigning jobs and maintaining segregated departments based upon race since July 2, 1965.

 EEOC further alleges that H. S. Camp has engaged in a practice of discrimination against female employees in assigning jobs and maintaining segregated departments based upon sex. EEOC submitted evidence establishing that on March 19, 1975, February 1, 1980, and five intermediate randomly-selected dates, no women were employed in the meat processing, smoked meats, delivery, maintenance, custodial, sales, receiving or shipping departments. The Court concludes that this evidence is sufficient to sustain plaintiff's initial burden of establishing a prima facie case.

 In rebuttal, H. S. Camp produced Dr. Scheaffer's confidence interval analysis of the departmental assignment of female employees in 1975 and 1980. Assuming the percentage of women in the relevant labor pool to be 30 to 40 percent as measured by the 1970 census, this analysis indicates that H. S. Camp randomly assigned female employees to departments in 1975 and 1980. The evidence further establishes that women were not automatically excluded from jobs which required heavy lifting, but rather generally were unable to perform such work due to physical limitations. Moreover, the evidence demonstrates that women were generally uninterested in the less desirable jobs at H. S. Camp. Finally, there is no evidence of any female employee who was denied a transfer request for a job for

which she was qualified. The Court, therefore, concludes that this evidence is sufficient to rebut EEOC's prima facie case of classwide discrimination against female employees in assigning jobs and maintaining segregated departments based upon sex.

### Promotions

EEOC alleges that H. S. Camp has engaged in a practice of discrimination against black and female employees in granting promotions since July 2, 1965. The Fifth Circuit in *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972), held that promotion procedures which are based almost entirely upon the subjective judgment and favorable recommendation of white male supervisors are a ready mechanism for discrimination. *Id.* at 358–59. *See also Falcon v. General Tel. Co. of Southwest*, 626 F.2d 369, 379–81 (5th Cir. 1980). The court in *Rowe* further stated that a promotion process which includes the following aspects is susceptible to discriminatory application and must be carefully scrutinized:

(i) The Foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.

(v) There are no safeguards in the procedure designed to avert discriminatory practices.

*Id.* at 358–59. If such a subjective promotional process is employed and few, if any, black or female employees are promoted to supervisory positions, then a strong case of discrimination has been established. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 345–47 (5th Cir. 1977).

H. S. Camp's promotional procedure is virtually identical to the process denounced in *Rowe*. The supervisor's judgment is critical in granting promotions. There are no written standards delineating the necessary qualifications for a promotion. Unlike the qualifications for entry level positions, the requirements for a supervisory position are vague and subjective. Employees only learn of promotional opportunities by word-of-mouth since no notices of job vacancies are posted. There is no evidence that H. S. Camp follows any safeguard procedure, such as an affirmative action program, which would avert discriminatory treatment of black and female employees in granting promotions.

The evidence further establishes that H. S. Camp generally promotes employees to supervisory positions rather than hiring a person to start as a supervisor. With the exception of Patricia Dawson, H. S. Camp has never promoted a black or female employee to a supervisory position. Moreover, the supervisory promotion of Patricia Dawson is entitled to little weight since it occurred after Patty Coffie filed her charge of discrimination against H. S. Camp with EEOC and shortly before EEOC initiated this action.

The Court concludes that this evidence establishes a prima facie case of a practice of discrimination against black and female employees in granting promotions since July 2, 1965. In rebuttal, H. S. Camp has merely produced some evidence that certain individual employees who complained of being denied a promotion failed to apply for a supervisory position. This evidence is insufficient to rebut EEOC's prima facie case of classwide discrimination against black and female employees based upon race and sex in granting promotions since July 2, 1965.

### Wages

EEOC alleges that H. S. Camp engaged in a practice of discrimination against black and female employees in paying wages

since August 15, 1974. In support of this claim, EEOC presented statistical evidence showing that from May 31, 1975 through November 1, 1978, the average weekly pay of white employees was $101.20 more than that of black employees, while the average gross weekly pay of male employees was $91.10 more than that of female employees. Further statistical evidence introduced by EEOC demonstrated that from 1976 through 1978 the average gross weekly pay of newly-hired white employees was $29.28 more than that of newly-hired black employees, while the average gross weekly pay of newly-hired male employees was $45.90 more than that of newly-hired female employees. This statistical evidence, however, fails to account for seniority and the type of job being performed. Such factors are critical in analyzing the earnings of employees, particularly here since these are the primary criterion used by H. S. Camp in establishing wages.

EEOC attempted to bolster its statistical evidence with testimony from black and female employees. However, the evidence establishes that all of the employees who testified with regard to compensation received regular and appropriate raises. The Court, therefore, concludes that EEOC has failed to establish a prima facie of a practice of discrimination against black and female employees based upon race and sex in setting wages. Even assuming arguendo that EEOC's statistical evidence was sufficient to establish a prima facie case, the Court concludes that H. S. Camp's statistical evidence concerning employee earnings is sufficient to rebut a prima facie case.

### Terms and Conditions

EEOC alleges that H. S. Camp has engaged in a practice of discrimination against black employees in the terms, conditions, and privileges of employment since July 2, 1965. The management of H. S. Camp has never used nicknames intending to demean or insult employees. The evidence fails to establish the use of racial epithets by the management of H. S. Camp.

David Ramsey, a black employee, testified that black employees generally work on the loading dock at night and that black employees are often not given telephone messages promptly. This testimony was unrebutted. However, no further testimony or evidence was introduced to corroborate Mr. Ramsey's testimony. The evidence establishes that Herbert Miller, a white male supervisor, threatened Israel Dempsey with a knife and forced him to stay and clean the kill floor. However, this was only an isolated incident and there is no evidence that such threats by supervisors against black employees was a regular practice. Moreover, Ulysses Grant, a black employee, testified that he never saw black employees being treated unfairly and that he thought H.S. Camp had treated him well.

The Court concludes that EEOC has failed to establish a prima facie case of a practice of discrimination against black employees in the terms, conditions and privileges of employment.

### Segregated Restroom Facilities

EEOC claims that H. S. Camp has maintained a racially-segregated restroom facility since July 2, 1965. H. S. Camp presented evidence that the partition which divides the men's restroom in half is needed to support the lockers. The lockers, however, are bolted together and to the floor. Furthermore, rather than running parallel to the row of lockers and supporting each locker, the partition is perpendicular to the row of lockers and touches only two lockers. Moreover, the partition is approximately 11 feet long extending to the entrance of the restroom. The portion of the partition which extends to the entrance of the restroom serves no other purpose than to divide the restroom in half.

The testimony of numerous employees establishes that black employees were expected to and sometimes told to use only the right side of the restroom while white employees used the left side. The Court concludes that EEOC has established by a preponderance of the evidence that H. S. Camp has maintained racially-segregated restroom facilities since July 2, 1965.

### EEOC Posters

EEOC alleges that H. S. Camp has willfully failed or refused to post EEOC posters since July 2, 1965. The evidence establishes that the general practice of H. S. Camp has been to display all required EEOC posters and bulletins on the employee bulletin board. The evidence further establishes that the delay in obtaining and posting EEOC posters from October 1979 through April 1980 was not intended to deny any employee of his or her rights and there is no evidence that any employee was adversely affected by the failure to display the posters during that period of time. The Court, therefore, concludes that EEOC has failed to establish by a preponderance of the evidence that H.S. Camp has willfully failed or refused to display EEOC posters at its plant.

### Discharges

EEOC alleges that H. S. Camp has engaged in a practice of discrimination in discharging black employees since August 15, 1974. EEOC's expert statistician, Dr. Gitlow, conducted an analysis of H. S. Camp's discharging practices comparing the percentage of black and white employees who were involuntarily discharged from March 19, 1975 through February 1, 1980. However, his analysis showed only a moderate statistical disparity. Moreover, Dr. Gitlow admitted that his analysis was based upon incomplete data and a series of assumptions, and even indicated some uncertainty as to the accuracy of the underlying figures.

Attempting to bolster Dr. Gitlow's statistical evidence, EEOC presented the testimony of several black employees who had been involuntarily discharged. However, with the exception of Patty Coffie, the evidence establishes that each employee was discharged based upon a legitimate non-discriminatory reason and that race was not a factor in the discharge decisions. Moreover, the evidence establishes that Ms. Coffie's discharge was only an isolated event and not part of a regular practice of discharging black employees because of

their race. The Court, therefore, concludes that EEOC has failed to establish a prima facie case of a practice of discrimination in discharging black employees because of their race.

EEOC further alleges that H. S. Camp discharged Patty Coffie because of her race and sex. A prima facie individual case of discrimination in discharging an employee may be established by showing that the plaintiff (1) is a member of a protected minority, (2) was qualified for the job from which he or she was discharged, (3) was discharged, and (4) that after the plaintiff was discharged, the defendant hired a person not in the plaintiff's protected class. *Lindsey v. Mississippi Research and Dev. Center*, 652 F.2d 488, 491 (5th Cir. 1981); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 120–21 (5th Cir. 1980); *Marks v. Pratt-co, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979).

The evidence establishes that Ms. Coffie, a black employee, is a member of a protected minority and that she was discharged from a position for which she was qualified. The evidence further establishes that shortly after Ms. Coffie's discharge, H. S. Camp hired Bruce LaPointe, a white male, on August 27, 1974. The Court concludes that this evidence establishes a prima facie case of discrimination in discharging Patty Coffie because of her race and sex.

In rebuttal, H. S. Camp asserts that Ms. Coffie was discharged for the legitimate non-discriminatory reasons of abandoning her duties and disrupting the work force. However, the evidence establishes that Ms. Coffie suffered pain due to menstrual cramps on August 15, 1974 and complied with the company rules and procedures by leaving a message with Monroe Leahmon to be given to her supervisor indicating that she was sick and had gone home. There is no evidence that Ms. Coffie disrupted the work force by announcing to other employees that she was not going to do all the work because she was sick. Like Ezra Ferrell, Patty Coffie was ill and, therefore, her absence was justified. Ezra Ferrell was aware that Ms. Coffie probably would be

absent on August 15, 1974 due to illness and that he might be the only person at work that day who could operate the machines in the sausage department. However, Ezra Ferrell, a white male employee, was not fired. Moreover, under circumstances virtually identical to the facts surrounding Ms. Coffie's discharge, H. S. Camp gave a white male employee two weeks vacation and only a demotion.

 The Court, therefore, concludes that EEOC has shown that the reasons offered by H. S. Camp for Ms. Coffie's discharge are merely pretext. *Texas Dep't of Community Affairs v. Burdine, supra.* Consequently, the Court concludes that EEOC has established by a preponderance of the evidence that H. S. Camp discriminated against Patty Coffie by discharging her because of her race and sex.

A judgment shall be entered forthwith in accordance with the findings of fact and conclusions of law expressed in this opinion.

## JUDGMENT

In accordance with the opinion entered on this date, it is now

ORDERED and ADJUDGED:

1. The order entered on June 9, 1980 upon plaintiff's motion to amend the complaint to conform to the evidence is hereby modified to include the following paragraph:

 4. Plaintiff's motion to amend the complaint to include claims of a practice of discrimination based upon race and sex in paying wages since August 15, 1974 and a practice of discrimination based upon race in discharging employees since August 15, 1974, is hereby granted.

2. Defendant's motion to strike plaintiff's supplementary proposed findings of fact and conclusions of law and plaintiff's reply to defendant's response to plaintiff's post-argument memorandum of law is hereby denied.

3. Plaintiff's claim that H. S. Camp engaged in discriminatory hiring practices based upon race since July 2, 1965 is hereby dismissed with prejudice.

4. Plaintiff's claim that H. S. Camp engaged in discriminatory hiring practices based upon sex since July 2, 1965 is hereby dismissed with prejudice.

5. Judgment is hereby entered for plaintiff with respect to its claim that H. S. Camp engaged in a practice of discrimination against black employees in assigning jobs and maintaining segregated departments based upon race since July 2, 1965.

6. Plaintiff's claim that H. S. Camp engaged in a practice of discrimination against female employees in assigning jobs and maintaining segregated departments based upon sex since July 2, 1965 is hereby dismissed with prejudice.

7. Judgment is hereby entered for plaintiff with respect to its claim that H. S. Camp engaged in a practice of discrimination in failing to promote black employees because of their race since July 2, 1965.

8. Judgment is hereby entered for plaintiff with respect to its claim that H. S. Camp engaged in a practice of discrimination in failing to promote female employees because of their sex since July 2, 1965.

9. Plaintiff's claim that H. S. Camp engaged in a practice of discrimination against black employees because of their race in paying wages since August 15, 1974 is hereby dismissed with prejudice.

10. Plaintiff's claim that H. S. Camp engaged in a practice of discrimination against female employees because of their sex in paying wages since August 15, 1974 is hereby dismissed with prejudice.

11. Plaintiff's claim that H. S. Camp engaged in a practice of discrimination against black employees because of their race in the terms, conditions and privileges of employment since July 2, 1965 is hereby dismissed with prejudice.

12. Judgment is hereby entered for plaintiff with respect to its claim that H. S. Camp has maintained a racially-segregated restroom facility since July 2, 1965.

13. Plaintiff's claim that H. S. Camp has willfully failed or refused to post EEOC

posters since July 2, 1965 is hereby dismissed with prejudice.

14. Plaintiff's claim that H. S. Camp has engaged in a practice of discrimination in discharging black employees because of their race since August 15, 1974 is hereby dismissed with prejudice.

15. Judgment is hereby entered for plaintiff with respect to its claim that H. S. Camp discriminated against Patty Coffie by discharging her because of her race and sex.

16. Proceedings with respect to the remedies phase of this case shall be scheduled upon further order of the Court.